[No. 59619-5-I. Division One. June 2, 2008.]

*In the Matter of the Detention of* DENNIS ERIK LAW.

THE STATE OF WASHINGTON, *Respondent*, v. DENNIS ERIK LAW, *Appellant*.

32

*Jennifer M. Winkler* (of *Nielsen, Broman & Koch, PLLC*) and *Jennifer L. Dobson*, for appellant.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Carol J. Murray* and *Rod H. Scarr, Deputies*, for respondent.

¶1 Agid, J. — Dennis Law appeals the trial court's order of civil commitment based on a jury's finding that he is a sexually violent predator (SVP). He argues that (1) the trial court's exclusion of impeachment evidence and expert testimony on false confessions deprived him of his rights to confrontation and to present a defense, (2) the trial court deprived him of due process by admitting his statements to a polygrapher without determining that they were voluntary, (3) the presumption of innocence and the corpus delicti rule apply in SVP proceedings, and (4) the prosecutor committed misconduct by arguing that Law would receive appropriate treatment if committed. Because the trial court's evidentiary rulings were a proper exercise of discretion, Law has no due process right to a voluntariness determination of statements made to a polygrapher while on community placement, the presumption of innocence and corpus delicti rule are based on rights of defendants facing criminal convictions that do not apply in SVP civil proceedings, and Law fails to demonstrate that the pros-

ecutor's comments were deliberate and prejudicial, we affirm.

## FACTS

¶2 In the summer of 1985, Law was charged with communicating with a minor for immoral purposes when an 8 year old boy reported that Law offered him money in exchange for sex. Around the same time, Law was also arrested for approaching a 7 year old boy for sex. In 1986, Law was charged with second degree statutory rape involving a 12 year old boy who was also the alleged victim in a 1984 rape investigation that was declined for prosecution. Based on these incidents, Law pled guilty to two counts of communicating with a minor for immoral purposes.

¶3 In September 1992, after his release from prison on those convictions, Seattle police received complaints from patrons of the Seattle Center that Law was watching six to eight year old children while they were in the restroom, and Law was eventually ordered to stay away from the Seattle Center. That same month, Law was arrested and charged with first degree rape of a child when he lured a five year old boy to the basement laundry room of an apartment complex and exposed his penis. Law was also arrested after showing two young brothers pornography, masturbating in front of them, and trying to persuade them to be photographed nude. Based on these incidents, he pled guilty in 1992 to first degree kidnapping with sexual motivation and communication with a minor for immoral purposes.

¶4 In 2002, Law was released from prison and put on community placement. The conditions of his community placement prohibited him, among other things, from frequenting places where minors congregate. His community corrections officer (CCO), Patricia Turner, used polygraph tests to monitor his compliance with the conditions. She reported that Law was sanctioned six times for violating the conditions.

¶5 During a polygraph examination in April 2003, Law admitted that he used pornography, that he used the bathroom at a large downtown arcade, that he had seven victims in addition to the charged victims, and that he was sexually attracted to 13 and 14 year old males four or five times a day. In June 2003, University Book Store employees reported that Law had been following males aged 13 to 20 who were in the store. Law was on escape status at this time for failing to report to his CCO and remained on escape status until July 24, 2003.

¶6 During another polygraph examination in January 2005, he admitted that he followed 30 to 40 males, some of whom were "of questionable age"; that he had sexual thoughts of past victims two to three times a week, particularly when he saw someone of a similar age; that he used public restrooms, including the one at Westlake Mall, while minor males were present; and that encounters with minor males in restrooms were a high risk for him.

¶7 On September 14, 2005, the State filed a petition under RCW 71.09.030(5), alleging that Law was an SVP and seeking his confinement in a secure facility.[1] The trial court entered a finding that there was probable cause to believe that he was an SVP[2] and remanded Law to the custody of the Department of Social and Health Services at the Special Commitment Center (SCC), where he was ordered to undergo an evaluation pending trial. While at the SCC, Law refused treatment.

¶8 At trial, Richard Peregrin, the polygrapher to whom Law reported, testified to the admissions Law made during the polygraph interviews. He also testified that he gave Law a consent form stating that the offender understood

---

[1] RCW 71.09.030(5) permits the State to file such a petition against a person who has been previously convicted of a sexually violent offense, has since been released from total confinement, and committed a recent overt act. A "sexually violent predator" is a person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder that makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility. RCW 71.09.020(16).

[2] This determination is required by RCW 71.09.040(1).

that providing deceptive responses or failing to submit to the polygraph may be a violation of supervision and could result in sanctions being imposed, including loss of liberty. The State also presented testimony from Roger Wolfe, who performed a sexual deviancy evaluation of Law in September 2004. He diagnosed Law with pedophilia and had grave reservations about his ability to control himself. Wolfe's opinion was based on meetings with Law, statements Law made during the January 2005 polygraph interview, and other psychological testing and data. Dr. Harry Hoberman, a forensic psychologist, testified that Law suffered from a mental abnormality and personality disorder that made him "more likely than not" to engage in predatory acts of sexual violence if not confined to a secure facility.

¶9 Law presented expert testimony from Dr. John Wicks and Dr. Douglas Boer. Wicks testified that Law suffered from a brain injury that caused learning impairments and resulted in his becoming more passive and demonstrating fewer emotions. Boer also diagnosed Law with pedophilia but disagreed with Hoberman's conclusions about Law's personality disorder. He did not consider Law more likely than not to reoffend.

¶10 Law also testified and stated that he had trouble with his memory after suffering a heart attack and he could not remember his past crimes. He acknowledged going to the University Book Store but denied that he was following or looking in a sexual way at any of the minor males there. He also testified that Peregrin warned him that he had to tell the truth or Peregrin would end the polygraph examination and Law would go to jail. Law said that Peregrin's testimony about his statements was inaccurate. He denied making the statements that he had followed 30 to 40 minors; that he had sexual thoughts of past victims two to three times a week; that when he saw someone of similar age to the victim, it triggered a sexual thought; and that he had masturbated to thoughts of minors.

¶11 The jury returned a verdict finding that the State had proved beyond a reasonable doubt that Law was an

SVP. The court then ordered Law to be committed in a secure facility for control, care, and treatment pursuant to RCW 71.09.060.

## DISCUSSION

### I. *Admissibility of Impeachment Evidence*

¶12 Law contends that he was denied his constitutional right to confrontation when the trial court refused to admit impeachment evidence in the form of a letter criticizing Dr. Hoberman's professional judgment. The Sixth Amendment right to confront witnesses does not apply in SVP proceedings.[3] Thus, the relevant inquiry is whether the evidence was admissible as impeachment evidence.

¶13 We review a trial court's evidentiary rulings for an abuse of discretion.[4] ER 607 governs the use of impeachment evidence and provides that the credibility of a witness may be attacked by any party. Thus, a party has a right to cross-examine a witness to reveal bias, prejudice, or a financial interest in the outcome.[5] But while a party may use extrinsic evidence in these instances to impeach a witness and explore subjects that would otherwise be irrelevant, if the extrinsic evidence sought for impeachment constitutes hearsay, it is inadmissible.[6] In *Huynh*, the defendant sought to attack a police officer's credibility and show his bias with a medical record containing allegations that the police injured him during his arrest.[7] While acknowledging that ER 607 allows a party to attack a witness' credibility, the court held that this evidence was

---

[3] *In re Det. of Stout*, 159 Wn.2d 357, 369, 150 P.3d 86 (2007).

[4] *State v. Finch*, 137 Wn.2d 792, 810, 975 P.2d 967, *cert. denied*, 528 U.S. 922 (1999).

[5] *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

[6] *State v. Ngo Tho Huynh*, 107 Wn. App. 68, 76, 26 P.3d 290 (2001).

[7] *State v. Ngo Tho Huynh*, 107 Wn. App. 68, 72-73, 26 P.3d 290 (2001).

inadmissible because it was hearsay and did not qualify as an exception to the hearsay rule under ER 803(a)(4).[8]

¶14 Here, Law offered evidence of the American Board of Professional Psychology's (ABPP) denial of Dr. Hoberman's application for membership in the professional organization. Specifically, Law sought to introduce a letter sent by ABPP's executive officer and two feedback summaries from the examining committee. The letter from the executive officer informed Hoberman that his performance on the examination did not meet the criteria for certification. The two feedback summaries assessed his strengths and weaknesses, criticizing his tendency to make inappropriate credibility determinations. The examiners who wrote the summaries were not identified.

¶15 The trial court ruled that the contents of the letter were "clearly hearsay" and would not be admissible as substantive evidence. The court said Law could cross-examine Dr. Hoberman about his personal knowledge of being rejected by the ABPP and that individuals from the ABPP could testify about their professional knowledge about reasons for his rejection. But the court ruled that "to ask him about statements in the letter and asking him to explain it, deny it or admit it, [calls for] clearly inadmissible hearsay."

¶16 The trial court's ruling was correct. Like the medical record in *Huynh*, even if the ABPP letter demonstrated Dr. Hoberman's bias, it was still inadmissible hearsay. It contained out of court statements offered to prove the truth of the matter asserted, and Law points to no exception to the hearsay rule under which they would be admissible.[9]

¶17 *State v. Spencer*,[10] which Law cited in a statement of additional authorities, does not require a different result. In *Spencer*, the defendant sought to call as a witness a

---

[8] *Id.* at 76. ER 803(a)(4) provides an exception to the hearsay rule for statements made for purposes of medical diagnosis.

[9] *See* ER 801(c).

[10] 111 Wn. App. 401, 45 P.3d 209 (2002), *review denied*, 148 Wn.2d 1009 (2003).

woman who would testify that the defendant's girl friend, a State's witness, told this woman that the police intimidated and coerced her into talking with them; that she believed the defendant was not guilty but was afraid the police and Child Protective Services (CPS) would take her child away; and that she was angry about the defendant having a second girl friend.[11] The defendant offered the statements under ER 803(a)(3) as a statement of the declarant's state of mind.[12] The court held that this evidence was not hearsay because it was not offered for the truth of the matter asserted, but as evidence of the girl friend's state of mind. As the court explained, regardless of whether police coerced her or told her CPS would take her child away, the woman's testimony established what the girl friend's state of mind was when she talked to the police.[13]

¶18 But here, the impeachment evidence offered was not evidence of the declarant's state of mind. Rather, it consisted of out of court statements of unidentified examiners who criticized Dr. Hoberman's tendency to make inappropriate credibility determinations. This is precisely the reason it was offered: to show that Dr. Hoberman had been criticized for methods he used here. As such, the letters were out of court statements offered for the truth of the matter asserted and properly excluded as hearsay.

■ ¶19 Law's additional arguments that this evidence was relevant and the relevance outweighed any prejudice are misdirected. He argues the letters were relevant to rebut Dr. Hoberman's testimony that he judged Law's credibility by contrasting his history of denials with those who were more neutral parties and that the general practice in sex offender evaluations was to give more weight to admissions than denials. He contends that by excluding the letter, the trial court prevented him from presenting evidence that Dr. Hoberman had been criticized by an organi-

---

[11] *Id.* at 405-06.

[12] *Id.*

[13] *Id.* at 409.

zation in his field for his tendency to make inappropriate credibility determinations. But the trial court's ruling did not prevent him from presenting the same evidence. Had he called one of the examiners who denied Hoberman admission to the professional organization to testify about the reasons for the denial, the trial court would have admitted the testimony. What was impermissible was using inadmissible hearsay statements contained in the letters themselves, which was the only evidence Law offered.

## II. *False Confession Evidence*

■■ ¶20 Law next argues that the trial court's erroneous exclusion of expert testimony about police interrogation techniques and false confessions violated his constitutional right to present a defense. We review a trial court's ruling on the admissibility and scope of expert testimony for an abuse of discretion.[14] Expert testimony is admissible if (1) the witness qualifies as an expert, (2) the witness' opinion is based upon an explanatory theory generally accepted in the scientific community, and (3) the testimony will assist the trier of fact.[15]

¶21 Law asserts that he falsely confessed to Peregrin, the polygrapher, that he followed 30-40 minors from a distance and convinced himself he was not following them; that he had sexual thoughts of past victims two to three times a week, which were triggered when he saw someone of similar age; and that he had sexual thoughts of minor males whenever he saw them in public. Law sought to call Dr. Richard Leo, a social scientist who would testify about the social psychology of interrogation and the phenomenon of false confessions, including how police interrogation techniques induce false confessions and what the indicators of an unreliable confession were. He was also prepared to testify that the circumstances surrounding Peregrin's questioning of Law suggested unreliability, and that it was

---

[14] *Christensen v. Munsen*, 123 Wn.2d 234, 241, 867 P.2d 626 (1994).

[15] ER 702, 703; *State v. Cheatam*, 150 Wn.2d 626, 645, 81 P.3d 830 (2003).

improper for Dr. Hoberman to opine that Law's confession to following minors was true.

¶22 Initially the trial court ruled that Dr. Leo's testimony would be admissible based on Law's offer of proof. But after Law testified and denied making the statements to Peregrin, the trial court ruled that Dr. Leo's testimony would be excluded. The trial court concluded that this was not a false confession case, noting that during his testimony, Law "very much made it clear that he never made those statements . . . . [H]e never stated that he made those statements, but because he was threatened or forced or coerced, those statements are not true. . . . He simply denied the conduct."

¶23 The trial court's ruling was a proper exercise of discretion. Once Law denied making the alleged confession, any testimony about whether the confession was false was irrelevant and would not assist the trier of fact. Law contends that his testimony was not an outright denial, but ambiguous at best, and asserts that his testimony was simply that Peregrin misconstrued some of his statements. But claiming that one's statements have been misconstrued is not the same as claiming that one made a false statement. Expert testimony about false confessions is only relevant when a party claims that he confessed to something he did not do. And as the trial court correctly concluded, the record here does not support Law's argument that he gave a false confession. During direct and cross-examination, he denied that he told Peregrin that he had followed 30 to 40 minors, that he had sexual thoughts of past victims two to three times a week, and that when he saw someone of similar age to the victim it triggered a

sexual thought.[16] The trial court properly excluded Dr. Leo's testimony.[17]

¶24 Finally, Law contends that the trial court's exclusion of Dr. Leo's testimony was particularly harmful when considered in conjunction with the court's exclusion of the ABPP letter. He argues that the cumulative effect of both errors warrants reversal because both Dr. Leo's testimony and the ABPP letter would have allowed him to undermine Dr. Hoberman's reliance on Peregrin's testimony.[18] But as discussed above, the trial court committed no error by excluding this evidence, so there can be no cumulative error.

## III. *Voluntariness of Statements Made to Polygrapher*

¶25 Law also challenges the trial court's admission of his statements to Peregrin on the basis that they were coerced and therefore unreliable. The State contends that Law has no Fifth Amendment right against self-incrimination because SVP proceedings are civil, not criminal. But Law does not challenge the court's ruling on Fifth Amendment grounds. Rather, he argues that he had a due process right to require the trial court to determine whether his statement was voluntary, asserting that the "Fourteenth Amendment due process test for voluntariness of

---

[16] Law testified that "[Peregrin] said, to my shock days later, after I found out that I said that I was following 30 to 40 [minors], which I did not say." On direct examination he answered "no" when questioned whether he told Peregrin that he had sexual fantasies of his prior victims or minor males and whether he told Peregrin that he had sexual fantasies about anything or anyone. When asked on cross-examination whether it was accurate that he told Peregrin that when he sees someone of similar age to the victim it triggers a sexual thought, he answered, "No, I never said the things that he wrote down." He further testified that "[i]f he said that I see minors in public, I have sexual thoughts, you know. That's a mistake, because I did not say that[,] I wasn't saying that. . . . The statement is not true."

[17] Because we hold that Dr. Leo's testimony was properly excluded based on Law's denial that he made the statements he claims were falsely made, we do not address the State's argument that it should have also been excluded under King County Superior Court Local Rule 26(b).

[18] *State v. Perrett*, 86 Wn. App. 312, 322, 936 P.2d 426, *review denied*, 133 Wn.2d 1019 (1997).

confessions" applies. The State does not address Law's due process argument.

¶26 While the State is correct that the Fifth Amendment right against self-incrimination does not apply to SVP civil proceedings,[19] those facing SVP commitment are entitled to due process protections because civil commitment is a significant deprivation of liberty.[20] To determine what process is due in a given context, courts apply the test enunciated in *Mathews v. Eldridge*, which balances (1) the private interest affected; (2) the risk of erroneous deprivation of that interest through existing procedures and the probable value, if any, of additional procedural safeguards; and (3) the governmental interest, including costs and administrative burdens of additional procedures.[21]

¶27 Law argues that due process required the trial court to determine whether his statements were voluntary before admitting them. He asserts that the private risk affected—potentially permanent loss of liberty—is great, and the risk of erroneous deprivation of that right by the trial court's failure to make such determination is "enormous." Relying on case law analysis of the admissibility of confessions to police in criminal cases, he contends that requiring a determination of voluntariness here insulates the jury from " 'the taint of a coerced confession or statement.' "[22] He asserts that there is " 'a very real risk that a jury's determination of voluntariness may be influenced by the weight of other evidence, or the apparent truth of the confession.' "[23]

¶28 We first question whether Law properly preserved this issue for review.[24] He argued to the trial court that the

---

[19] *In re Pers. Restraint of Young*, 122 Wn.2d 1, 50, 857 P.2d 989 (1993).

[20] *Id.*

[21] 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); *see also Young*, 122 Wn.2d at 43-44.

[22] Br. of Appellant at 59 (quoting *State v. Rice*, 24 Wn. App. 562, 565, 603 P.2d 835 (1979)).

[23] *Id.* (qouting *Rice*, 24 Wn. App. at 565).

[24] The State does not address whether the issue has been properly raised on appeal.

statements were inadmissible because they were part of the polygraph process and polygraph evidence is inadmissible. He also argued that they were inadmissible as involuntary confessions because he was compelled to submit to the polygraph or risk violating his supervision. But it does not appear from the record that he actually ever requested a voluntariness hearing. Nor did he argue that the *Mathews* due process factors required a voluntariness hearing, which is the argument he now asserts on appeal. Thus, unless he raises a manifest error of constitutional magnitude, he may not assert this argument for the first time on appeal.[25] We conclude that because he fails to demonstrate a violation of his constitutional right to due process, he does not in fact raise a manifest constitutional error.

¶29 The voluntariness inquiry required by due process is derived from the Fifth and Fourteenth Amendments and appears to relate only to confessions of criminal suspects obtained by custodial interrogation for use in criminal prosecutions.[26] But here, the statements at issue did not involve a confession obtained by custodial interrogation. Rather, these were statements made during a polygraph interview to monitor Law's compliance with his community placement conditions. Under these circumstances, he was entitled to limited constitutional protections.

---

[25] RAP 2.5(a)(3); *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995) (citing *State v. Scott*, 110 Wn.2d 682, 686-87, 757 P.2d 492 (1988)).

[26] *Dickerson v. United States*, 530 U.S. 428, 433, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000). In *Dickerson*, the Court recognized that "the Due Process and Self-Incrimination Clauses . . . require that a *suspect* be accorded a fair trial free from coerced testimony" and that those clauses have been applied "to the context of custodial police interrogation." 530 U.S. at 435 n.1 (emphasis added). The Court further noted that in *Miranda* "[w]e concluded that *the coercion inherent in custodial interrogation* blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.' " *Id.* at 435 (emphasis added) (second alteration in original) (quoting *Miranda v. Arizona*, 384 U.S. 436, 439, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)); *see also Malinski v. New York*, 324 U.S. 401, 404, 65 S. Ct. 781, 89 L. Ed. 1029 (1945) ("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant."); *Brown v. Mississippi*, 297 U.S. 278, 56 S. Ct. 461, 80 L. Ed. 2d 682 (1936) (reversing criminal conviction under due process clause because it was based on confession obtained by physical coercion).

¶30 A defendant's constitutional rights during community placement are subject to the infringements authorized by the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW.[27] The SRA imposes a mandatory requirement that sex offenders be on community placement upon their release from prison and requires as a condition of that placement that the offender "perform affirmative acts [the Department of Corrections] deems appropriate to monitor compliance with the conditions of the sentence imposed."[28] This includes polygraph testing to monitor conditions of community placement.[29]

¶31 Thus, the confession here was obtained by a constitutionally permissible procedure used to monitor an offender's compliance with conditions imposed as a consequence of a criminal conviction. Unlike cases in which a voluntariness hearing is required, Law's statements were not made while he was being interrogated by police as a criminal suspect. He was therefore not entitled to the constitutional protections against coerced confessions that apply in the context of a criminal investigation. Consequently, he is unable to show that the trial court's failure to make a voluntariness determination poses a significant risk of an erroneous deprivation of his liberty interest.

¶32 In any event, the procedures the trial court used afforded Law sufficient due process. The court did not admit the results of the polygraph test as such, and it permitted Law to testify to his version of the interview. In doing so, Law denied making the statements. Voluntariness was no longer an issue because his own testimony made it irrelevant. Law fails to show that his due process rights were violated by the trial court's failure to make a voluntariness determination before admitting the statements.

---

[27] *State v. Riles*, 135 Wn.2d 326, 347, 957 P.2d 655 (1998) (quoting *State v. Ross*, 129 Wn.2d 279, 287, 916 P.2d 405 (1996)).

[28] RCW 9.94A.720(1)(a).

[29] *See Riles*, 135 Wn.2d at 342.

## IV. *Corpus Delicti Rule*

¶33 Law also contends that admitting the statements he made to Peregrin without some other corroborating evidence violates the corpus delicti rule. The State argues that the corpus delicti rule does not apply to civil commitment proceedings. The corpus delicti rule requires that "the body of the crime" be established before the defendant's admissions may be considered in determining whether the defendant committed the crime.[30] Thus, the rule requires some independent corroborating evidence that the defendant committed the crime.[31]

¶34 In *State v. M.R.C.*,[32] the court rejected the argument that the corpus delicti rule applies in civil commitment proceedings under RCW 71.05.280(3). There, the defendant was found incompetent to stand trial and was transferred to Western State Hospital pending a civil commitment hearing. The State then filed a petition seeking a 180 day commitment for involuntary treatment, alleging that he was gravely disabled due to a mental disorder and that as a result of the mental disorder, he committed acts constituting a felony and was likely to repeat those acts.[33] At the hearing, a police officer testified that M.R.C. told him that he molested an 11 year old child. M.R.C. objected that the corpus delicti rule required corroboration of that statement.[34] He argued that the State was required to prove that he committed acts constituting a felony so the corpus delicti rule applied.[35]

¶35 The court held that because the consequences of the hearing were not equivalent to a criminal conviction—no jail time was imposed, and no conviction was placed on his

---

[30] *State v. Aten*, 130 Wn.2d 640, 655-56, 927 P.2d 210 (1996).

[31] *State v. Brockob*, 159 Wn.2d 311, 328, 150 P.3d 59 (2006) (citing *Aten*, 130 Wn.2d at 656).

[32] 98 Wn. App. 52, 989 P.2d 93 (1999).

[33] *Id.* at 54.

[34] *Id.*

[35] *Id.*

record—it was not a criminal proceeding and the rule did not apply.[36] The court further noted that the involuntary commitment hearing was not analogous to a criminal proceeding because (1) the verdict need not be unanimous; (2) the standard of proof is clear, cogent, and convincing evidence, not proof beyond a reasonable doubt; (3) there was no requirement of showing intent, willfulness, or state of mind; (4) mental health professionals, not prosecutors, brought these actions; and (5) the purpose of commitment was treatment, not punishment.[37]

¶36 Law urges us to apply the corpus delicti rule in SVP proceedings, contending that unlike the civil commitment proceeding at issue in *M.R.C.*, SVP proceedings are criminal in nature. He notes that the requirements of a unanimous verdict and proof beyond a reasonable doubt mirror the standards required in criminal proceedings. This is true as far as it goes. But like a determination of mental incompetency under RCW 71.05.280, the consequences of a SVP finding are not equivalent to a criminal conviction because punishment is not the purpose of confinement under the SVP statute.[38] Our courts have recognized in several contexts that SVP proceedings are not criminal cases and have refused to confer on SVP respondents the rights a defendant would have in criminal proceedings.[39]

¶37 Nor is there is a requirement that the State prove intent, willfulness, or state of mind, as Law contends. He

[36] *Id.* at 57.

[37] *Id.*

[38] *Young*, 122 Wn.2d at 51 (noting that " 'the State serves its purpose of treating rather than punishing sexually dangerous persons by committing them to an institution expressly designed to provide psychiatric care and treatment' " (emphasis omitted) (quoting *Allen v. Illinois*, 478 U.S. 364, 373-74, 106 S. Ct. 2988, 92 L. Ed. 2d 296 (1986))).

[39] *Stout*, 159 Wn.2d at 369 (no Sixth Amendment right to confront witnesses in SVP proceeding); *Young*, 122 Wn.2d at 21-26, 51 (refusing to apply the ex post facto and double jeopardy clauses and the Fifth Amendment privilege against compulsory self-incrimination in SVP proceedings); *In re Det. of Aqui*, 84 Wn. App. 88, 101, 929 P.2d 436 (1996) (refusing to apply the rule of lenity and presumption of innocence in SVP cases), *review denied*, 133 Wn.2d 1015 (1997), *abrogated on other grounds by In re Det. of Hendrickson*, 140 Wn.2d 686, 2 P.3d 473 (2000).

argues that because the State is required to prove that his overt act created a reasonable apprehension of harm, proof of his state of mind is required. But the state of mind at issue in this determination is not that of the offender. Rather, it relates to the objective standard the jury must apply to determine if his acts created a reasonable apprehension of harm in a third party, i.e., someone who knows of his condition and history. Thus, the jury was not required to find that he intended a harmful act. Indeed, because the proof required here involved establishing an "overt act," rather than a crime, there is even less justification for applying the corpus delicti rule here than in *M.R.C.*, where proof of a crime (a felony) was required. Because SVP proceedings are civil rather than criminal, the case law supports the State's argument that the corpus delicti rule does not apply.

## V. *Presumption of Innocence*

 ¶38 Law next contends that he was entitled to a jury instruction stating that he was presumed not to meet the commitment criteria, much like the presumption of innocence instruction required in criminal cases. The trial court refused this instruction based on case law holding that offenders in SVP proceedings are not entitled to a presumption of innocence instruction.[40] Law contends that in civil commitment proceedings under chapter 71.05 RCW, such an instruction is required and the State does not have a valid reason for providing different procedural protections for those confined under the SVP statute. Thus, he argues, his right to equal protection was violated.

¶39 The presumption of innocence is required in criminal proceedings because of the State's burden to prove beyond a reasonable doubt each element of a crime.[41] But because SVP proceedings are civil, our courts have held in

---

[40] But the court did instruct the jury that the State had the burden of proving the commitment criteria beyond a reasonable doubt and that Law had no burden to establish that a reasonable doubt exists.

[41] *In re Det. of Twining*, 77 Wn. App. 882, 895, 894 P.2d 1331, *review denied*, 127 Wn.2d 1018 (1995).

*In re Detention of Twining* and *In re Detention of Aqui* that an offender is not entitled to an instruction stating that the offender was presumed not to be a sexual predator.[42] Law offers no compelling reasons to depart from these decisions.

¶40 Law argues that *Twining* and *Aqui* should not control here because at the time they were written, the State was not required to prove a recent overt act. But as the trial court concluded, this does not in itself create a reason to depart from the holdings in *Twining* and *Aqui*, and Law provides no compelling justification to do so. He simply argues that such an instruction "would properly protect a respondent's rights and better separate the jury's consideration of an 'overt act' allegation from its consideration [of] the other statutory factors."

¶41 Law's equal protection argument is also without basis. He cites *Dunner v. McLaughlin*[43] for the proposition that an individual facing civil commitment under chapter 71.05 RCW is entitled to a presumption of innocence instruction. But that case did not involve the rejection of a presumption of innocence instruction, as he suggests. Rather, the trial court there failed to give an instruction that the detainee was not compelled to testify and that the jury could not presume mental illness from his failure to testify.[44] The involuntary commitment statute at issue there, chapter 71.05 RCW, provided that the detainee had the right to remain silent and that no person shall be presumed incompetent as a consequence of receiving evaluation or treatment for a mental disorder.[45] Thus, the court

---

[42] *In re Det. of Twining*, 77 Wn. App. 882, 894 P.2d 1331, *review denied*, 127 Wn.2d 1018 (1995); *In re Det. of Aqui*, 84 Wn. App. 88, 101, 929 P.2d 436 (1996), *review denied*, 133 Wn.2d 1015 (1997), *abrogated on other grounds by In re Det. of Hendrickson*, 140 Wn.2d 686, 2 P.3d 473 (2000).

[43] 100 Wn.2d 832, 676 P.2d 444 (1984).

[44] *Id.* at 847.

[45] RCW 71.05.250, .310, .450.

held that if requested, such an instruction was proper and reversed the trial court.[46]

¶42 Law points to no similar statutory provision that provides a right to remain silent in SVP proceedings or prohibits a finding of SVP status based on an offender's failure to testify. Indeed as discussed above, the case law is clear that offenders facing SVP commitment have neither a privilege against self-incrimination nor the right to remain silent.[47] The civil commitment and sexual predator statutes are not identical in purpose or function. Law cites no authority and provides no reasons why we should treat them as if they are. Law's reliance on *McLaughlin* is therefore misplaced, and his equal protection claim fails.

## VI. *Prosecutorial Misconduct*

■■ ■■ ¶43 Law contends that the prosecutor committed misconduct by violating the trial court's ruling prohibiting argument that he would receive treatment if confined to the SCC. Prosecutorial misconduct is grounds for reversal when actual misconduct occurs and there is a substantial likelihood that the misconduct affected the jury's verdict.[48] The defense bears the burden of establishing both the impropriety and prejudicial effect.[49] This court views alleged misconduct "in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given."[50]

■■ ¶44 But absent a proper objection to the comments at trial, a request for a curative instruction, or a motion for mistrial, we will not reverse a verdict on appeal unless the prosecutor's behavior was "so flagrant and ill intentioned that no curative instructions could have obviated the preju-

---

[46] *McLaughlin*, 100 Wn.2d at 847.

[47] *Young*, 122 Wn.2d at 51.

[48] *State v. Hoffman*, 116 Wn.2d 51, 93, 804 P.2d 577 (1991).

[49] *Id.*

[50] *State v. Graham*, 59 Wn. App. 418, 428, 798 P.2d 314 (1990).

dice engendered by the misconduct."[51] Failure to request a curative instruction or move for a mistrial "strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial."[52] Nor may counsel " 'remain silent, speculating upon a favorable verdict, and then, when it is adverse, use the claimed misconduct as a life preserver . . . on appeal.' "[53]

¶45 Here, Law moved in limine to exclude any reference to the SCC as a treatment facility or any argument that it was the best place for Law. The trial court ruled that the State could mention that the SCC was a treatment facility only in the context of Law's failure to engage in treatment and that Law could not introduce evidence that the facility is inadequate and has been criticized. In closing argument, the prosecutor stated:

> Ladies and gentlemen, it doesn't take a rocket scientist to look at these facts and figure out that . . . Mr. Law[ ] needs to be committed to a secure setting. The special commitment center is a treatment facility. . . . Chanting to a string of beads does not cure pedophilia. Intense treatment in a secure facility whose specialty is to do this, the commitment center hopefully will.

Law did not object.

¶46 Law argues that this argument amounts to misconduct and was deliberate and flagrant because it was in "clear violation" of the trial court's ruling in limine and "contrary to the prosecutor's word." He further contends this comment was prejudicial because he was prohibited from arguing that the treatment at SCC was inadequate. But Law fails to demonstrate that the prosecutor's remarks were so flagrant and prejudicial to warrant reversal despite his failure to object.

---

[51] *State v. Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988).

[52] *State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990), *cert. denied*, 498 U.S. 1046 (1991).

[53] *Id.* (quoting *Jones v. Hogan*, 56 Wn.2d 23, 27, 351 P.2d 153 (1960)).

¶47 A prosecutor's remarks in closing are flagrant and highly prejudicial when they deliberately appeal to the jury's passion and prejudice and encourage a verdict that was not based on properly admitted evidence.[54] But counsel "must be accorded a reasonable latitude in argument to draw and express inferences and deductions from the evidence."[55] And a prosecutor's remarks that would otherwise be improper are not grounds for reversal when they are in reply to defense counsel's statements, unless the remarks are so prejudicial that an instruction would not cure them.[56]

¶48 Here the prosecutor argued that based on all the facts presented, Law needed to be confined to a secure facility, the SCC, which was a treatment center, and that hopefully intensive treatment would help him with his pedophilia. The prosecutor made these remarks at the end of her closing argument and appeared to be reiterating her discussion of proof of the element of the risk of reoffense—whether he was more likely than not to reoffend if not confined to secure facility. In discussing this element, the prosecutor referred to Law's history of failing and refusing treatment at the SCC, which were facts in evidence and ruled admissible by the trial court. Law argued that the evidence showed that he could be treated in the community and that there was no basis to confine him as an SVP.

¶49 Thus, stating that the secure facility to which he should be confined was a treatment center and would hopefully treat his pedophilia was a reasonable response to Law's argument that existing treatment options in the community were adequate to address his condition. Taken in context, these comments were proper argument and do not amount to misconduct, much less flagrant and deliberate misconduct warranting reversal. And, while the comment that the SCC will "hopefully" cure Law's pedophilia

---

[54] *Belgarde*, 110 Wn.2d at 507-08.

[55] *Swan*, 114 Wn.2d at 662-63.

[56] *Id.* at 663.

arguably violated the trial court's ruling in limine, Law fails to show that a curative instruction would not have obviated the error.[57] The jury already heard that the SCC was a treatment center and that he refused treatment there. The trial court could have instructed the jury to limit its consideration of the SCC to those facts, which were properly in evidence.

VII. *Evidence of Sanctions for Violations of Community Custody*

¶50 Finally, Law challenges the trial court's denial of his motion to exclude testimony from his CCO about sanctions he received for community placement violations. He contends that because this is evidence of judicial findings that he violated placement conditions, it should have been excluded as a judicial comment on the evidence prohibited by article IV, section 16 of the Washington Constitution.[58] But the Washington Supreme Court has already rejected the argument that a prior adjudication is an impermissible comment on the evidence. In *State v. Gentry*, the court held that a trial court's admission of a judgment bearing a trial judge's name was not an unconstitutional comment on the evidence.[59] The rule prohibiting judicial comment on the evidence is even more attenuated here where the claimed evidence of a judicial determination is only the fact of the violations. There was no evidence before the jury that sanctions for the violations were imposed by a judge.

¶51 Nor was there any evidence that a judge made a finding on a specific recent overt act, as Law suggests.

---

[57] *See A.C. v. Bellingham Sch. Dist.*, 125 Wn. App. 511, 525, 105 P.3d 400 (2004) (when a party who prevails on a motion in limine later suspects a violation of that ruling, that party has a duty to bring the violation to the court's attention to allow the court to decide what remedy, if any, to direct).

[58] That provision states, "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law."

[59] 125 Wn.2d 570, 639, 888 P.2d 1105, *cert. denied*, 516 U.S. 843 (1995); *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 972 P.2d 1250 (1999).

While his CCO testified that he was arrested on the date of the polygraph and later sanctioned for violations, the State did not offer any evidence that a judge sanctioned him based on the polygraph admissions. The State offered them only to show that Law was incapable of following through with his supervision conditions if released. Law fails to establish that the testimony constituted an impermissible comment on the evidence.

¶52 We affirm the order of commitment.

Cox and APPELWICK, JJ., concur.

Review denied at 165 Wn.2d 1028 (2009).