**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

Filed
Washington State
Court of Appeals
Division Two

January 4, 2022

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of: | No. 54144-1-II |
| J.M. | |
| Appellant. | PUBLISHED OPINION |

LEE, C.J. — J.M. appeals the trial court's order for 180 days of involuntary commitment. J.M. argues that (1) his statutory right to remain silent under former RCW 71.05.360(8)(d) (2017)[1] was violated, (2) his due process rights under the Fifth Amendment apply in an involuntary commitment hearing and his due process rights were violated when the trial court erroneously admitted testimony that violated his *Miranda* rights, (3) the trial court erred by admitting testimony relating to felony harassment that violated the best evidence rule, and (4) the trial court failed to make sufficiently specific findings to permit meaningful appellate review. The State concedes that the trial court improperly admitted testimony relating to felony harassment in violation of the best evidence rule.

We hold that (1) the trial court made sufficiently specific findings to permit meaningful appellate review (2) J.M.'s statutory right to remain silent was not violated; (3) J.M.'s due process rights were not violated because the Fifth Amendment right to remain silent does not apply in an involuntary commitment hearing; and (4) the State correctly concedes that the trial court erred in

---

[1] *Repealed by*, LAWS OF 2020, ch. 302, § 104. Former RCW 71.05.360(8)(d) was replaced by RCW 71.05.217(5)(b). Former RCW 71.05.360(8)(d) contained a list of rights available at the probable cause hearing for involuntary commitments.

No. 54144-1-II

admitting certain testimony in violation of the best evidence rule, but the error does not require reversal of the involuntary commitment order. Accordingly, we affirm the trial court's order committing J.M. for 180 days of involuntary commitment but remand for the trial court to strike references to felony harassment in the involuntary commitment order.

FACTS

J.M. was caught attempting to steal a number of items from a store. J.M. later admitted that he intended to pawn the stolen items in order to get money to purchase a handgun. He further admitted that he wanted the handgun to kill his "ex-girlfriend's"[2] boyfriend. J.M. was charged with the felony offenses of theft with intent to resell and three counts of harassment with the threat to kill.

The trial court found that J.M. was not competent to stand trial, and efforts to restore his competency were not successful. Therefore, the trial court dismissed all charges and ordered that J.M. be evaluated for civil commitment.

After evaluation, the State petitioned the trial court for an order to commit J.M. for 180 days of involuntary treatment on two grounds. First, the State contended that J.M. was gravely disabled as a result of a behavioral health disorder. Second, the State contended that J.M., who was "determined to be incompetent and criminal charges have been dismissed pursuant to RCW 10.77.086(4), has committed acts constituting a felony, and as a result of a mental disorder, presents a substantial likelihood of repeating similar acts." Clerk's Papers (CP) at 43.

---

[2] J.M.'s "ex-girlfriend" was the 16-year-old friend of J.M.'s sister. The "ex-girlfriend" claims that she did not know J.M. and had never dated him.

No. 54144-1-II

A.   INVOLUNTARY COMMITMENT HEARING

At the involuntary commitment hearing, the State presented the following evidence. Brandon Melvin was the asset protection manager for the store that J.M. stole from.  After Melvin caught J.M. stealing from the store, he and John Ranney, an assistant store manager, escorted J.M. to the asset protection office.  At the office, J.M. told Melvin and Ranney that he was planning on pawning the stolen merchandise in order to buy a gun.  J.M. said that he wanted the gun so he could shoot his "ex-girlfriend's" boyfriend.  The total cost of the items J.M. took was slightly under $400.

Officer Stacy Wilson responded to the store for the incident involving J.M.  After arriving at the store, Officer Wilson read J.M. his *Miranda*[3] rights, including the right to remain silent. J.M. said he understood and waived his rights.  J.M. then admitted to stealing from the store, stating that he intended to pawn the stolen items in order to get enough money to purchase a handgun to kill his "ex-girlfriend's" boyfriend.

Detective Matthu Brooks later interviewed J.M. after he read J.M. his *Miranda* rights, including the right to remain silent.  J.M. agreed to be interviewed.  The interview between Detective Brooks and J.M. was recorded.

In the recorded interview, J.M. described the items he stole from the store.  J.M. also told Detective Brooks that he stole the items because he was going to sell them in order to purchase a firearm.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

No. 54144-1-II

J.M. moved to suppress the recorded interview and Detective Brooks' testimony regarding the statements J.M. made during the interview. J.M.'s motion relied on the competency evaluation, which stated that J.M. did not understand his Fifth Amendment rights, including the right to remain silent, and that J.M. would not be able to understand his rights with education. The trial court noted J.M.'s motion for the record, then allowed Detective Brooks' testimony to continue. The trial court also reserved the right to exclude the recorded interview.

When the State sought to admit the recorded interview, J.M. objected. The trial court again noted the objection for the record. The trial court also said it "may entertain a motion to strike." Verbatim Report of Proceedings (VRP) (Nov. 25, 2019) at 64. After a portion of the recorded interview was played, the trial court stated, "I'm still reserving the right to disallow the whole tape." VRP (Nov. 25, 2019) at 70. The trial court never excluded the recorded interview.

The State also presented testimony from Taylor Hornbeck. Hornbeck was a friend of J.M.'s sister and a friend of J.M.'s "ex-girlfriend." On one occasion, J.M. texted Hornbeck, asking her if she would reach out to his "ex-girlfriend." Hornbeck asked J.M. to not talk to her about his "ex-girlfriend." J.M. also messaged Hornbeck on Facebook. In that message, J.M. stated that he would fatally shoot or dreadfully murder anyone who stood in the way of him and his "ex-girlfriend." Hornbeck testified that she took this message as a threat because she had stood in the way of J.M. and his "ex-girlfriend" being together when she refused to talk with J.M. about his "ex-girlfriend." Because of this threat, she said she did not want to leave the house as she was not sure if J.M. knew where she lived.

4

No. 54144-1-II

J.M. objected to Hornbeck's discussion of the Facebook message, arguing that the best evidence rule applied. J.M. contended that Hornbeck could not testify to the description of the message because no written document was admitted. The State replied, "I'm asking the witness what the respondent—what he communicated to her, what she has described as a threat." VRP (Nov. 25, 2019) at 52. The trial court allowed the testimony to continue. The trial court later stated, "I'll allow the threat. That's as far as I'm going." VRP (Nov. 25, 2019) at 53.

B.      FINDINGS AND CONCLUSIONS

In its written findings of fact and conclusions of law, the trial court concluded that J.M. was gravely disabled and in danger of serious physical harm as a result of a behavioral health disorder. The trial court found that J.M.'s current behavioral health status examination revealed he had "[d]elusional thought[,] disorganization, mood lability, self harm, limited insight, currently needs the supervised setting of the hospital, poor insight." CP at 59. The trial court further found that J.M. committed both felonies of theft with intent to resell and harassment with threats to kill.

The trial court's written order also stated that "[i]n addition to the findings of fact and conclusions of law written below, the court incorporates by reference the oral findings of fact and conclusions of law." CP at 57. The trial court's oral findings included a finding that "given the diagnosis and some [of] the things that have been going on for you, I'm also making a finding that you're gravely disabled." VRP (Nov. 25, 2019) at 110. The trial court went on to find that "it looks to me like you have made some improvements since you've been here in the hospital at least from the testimony." VRP (Nov. 25, 2019) at 111. But, the trial court stated, "I don't think you're ready, at this point, to leave the hospital." VRP (Nov. 25, 2019) at 111. The trial court further

5

No. 54144-1-II

found that J.M. had indicated he was trying to get money to get a gun and that, based on the victim's testimony, "there's no question in [the trial court's] mind that there was a threat and she was in fear for her life." VRP (Nov. 25, 2019) at 110.

J.M. appeals.

ANALYSIS

A.     SUFFICIENCY OF SPECIFIC FINDINGS

J.M. argues that the trial court failed to make sufficiently specific findings to permit meaningful appellate review. Specifically, J.M. argues that the trial court failed to provide sufficiently specific findings regarding whether he committed acts that constituted felonies. We disagree.

The trial court must make and enter findings of fact at an involuntary commitment hearing. *In re Det. of LaBelle*, 107 Wn.2d 196, 218, 728 P.2d 138 (1986). These findings must be sufficiently specific to permit meaningful review. *Id.* The degree of specificity depends on the circumstances of the particular case. *Id.* Generally, the findings "should at least be sufficient to indicate the factual bases for the ultimate conclusions." *Id.*

Findings of fact that are standardized and general are not sufficient. *Id.* at 219. Merely checking the boxes of a standardized order without making any additional findings is not sufficient to permit meaningful appellate review. *In re Det. of G.D.*, 11 Wn. App. 2d 67, 70, 450 P.3d 668 (2019). "[W]ritten findings may be supplemented by the trial court's oral decision or statements in the record." *LaBelle*, 107 Wn.2d at 219.

6

No. 54144-1-II

Here, the trial court entered written findings and conclusions. In its written order, the trial court ruled that "[i]n addition to the findings of fact and conclusions of law written below, the court incorporates by reference the oral findings of fact and conclusions of law." CP at 57.

The trial court found that J.M. was gravely disabled and, as a result of a behavioral health disorder, was in danger of serious physical harm resulting from the failure to provide for his essential needs of health or safety. The trial court also found that J.M.'s current behavioral health status examination revealed he had "[d]elusional thought[,] disorganization, mood lability, self harm, limited insight, currently needs the supervised setting of the hospital, poor insight." CP at 59. The trial court further found J.M.'s diagnosis as the reason for concluding he was gravely disabled. The trial court stated, "I don't think you're ready, at this point, to leave the hospital." VRP (Nov. 25, 2019) at 111.

And the trial court found that J.M. committed theft with intent to resell. "In fact, it is what you indicated . . . you were trying to get some money to get this gun." VRP (Nov. 25, 2019) at 110. These findings allow for meaningful appellate review because it provides this court with a record of the trial court's findings that led to its conclusions. Thus, the record is sufficient for meaningful appellate review because it provides this court with a record of how the trial court reached its ultimate conclusions. Therefore, we find that the trial court provided sufficiently specific findings to provide a meaningful review.

No. 54144-1-II

B.      STATUTORY RIGHT TO REMAIN SILENT UNDER FORMER RCW 71.05.360(8)(d)

J.M. argues that former RCW 71.05.360(8)(d) must apply to statements obtained during custodial interrogations. As a result, he argues, the trial court's admission of statements he made to law enforcement violated his statutory right to remain silent. We disagree.

Issues of statutory construction are questions of law subject to de novo review. *State v Evans*, 177 Wn.2d 186, 191, 298 P.3d 724 (2013). "The purpose of statutory interpretation is 'to determine and give effect to the intent of the legislature.'" *Id.* at 192 (quoting *State v. Sweany*, 174 Wn.2d 909, 914, 281 P.3d 305 (2012)). "[W]e derive legislative intent solely from the plain language enacted by the legislature" when possible. *Id.* "Plain language that is not ambiguous does not require construction." *Id.*

Former RCW 71.05.360(8)(d) states that "[a]t the probable cause hearing the detained person shall have the following rights . . . [t]o remain silent." The rights set forth under former RCW 71.05.360(8)(d) apply to 180-day involuntary commitment hearings. Former RCW 71.05.360(1)(a).

We derive legislative intent from the plain language of the statute because former RCW 71.05.360(8)(d) is unambiguous. The plain language states that an individual has the right to remain silent "[a]t the probable cause hearing." Former RCW 71.05.360(8)(d). Because the plain language is not ambiguous, we hold that former RCW 71.05.360(8)(d) applies to the right to remain silent at the probable cause hearing; it does not apply the right to remain silent during a custodial interrogation in an underlying investigation that leads to an involuntary treatment petition.

8

No. 54144-1-II

Here, J.M. argues that former RCW 71.05.360(8)(d) should apply to statements he made to law enforcement during custodial interrogations. But these statements are not covered by former RCW 71.05.360(8)(d) because they were out of court statements and were not made by J.M. during the involuntary commitment hearing.

C.      DUE PROCESS AND THE FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION

J.M. argues that due process requires involuntary statements made to law enforcement during custodial interrogations be excluded in involuntary commitment hearings.[4] Therefore, J.M. contends, his due process rights were violated when the trial court admitted the involuntary statements he made to Officer Wilson and Detective Brooks because his competency to stand trial evaluation showed that he did not understand his Fifth Amendment right against self-incrimination.[5] We disagree.

---

[4] J.M.'s assignments of error state that the admission of the statements violated his due process rights under both the Fifth Amendment to the United States Constitution and article I, section 3 of the Washington Constitution. However, J.M. makes no mention of article I, section 3 of the Washington Constitution in his analysis. Further, J.M. does not perform any *Gunwall* analysis. *See State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986). Therefore, we do not consider J.M.'s article I, section 3 claim. *See State v. Olivias*, 122 Wn.2d 73, 82, 856 P.2d 1076 (1993) (declining to consider state constitutional grounds where appellants failed to address *Gunwall* factors and failed to analyze the federal and state constitutions separately or explain why a distinction should be made between the federal and state constitutional rights).

[5] J.M. did not object to the admission of statements he made to Officer Wilson at the trial court and raises a challenge to those statements for the first time on appeal. Generally, we do not consider errors raised for the first time on appeal, except when it is a manifest error affecting a constitutional right. RAP 2.5(a)(3); *See In re Det. of Strand*, 167 Wn.2d 180, 187, 217 P.3d 1159 (2009). To meet RAP 2.5(a), "an appellant must demonstrate (1) the error is manifest, and (2) the error is truly of constitutional dimension." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). An error is "manifest" if an appellant shows actual prejudice. *Id.* at 99. "To demonstrate actual prejudice, there must be a 'plausible showing by the [appellant] that the asserted error had

9

No. 54144-1-II

J.M. contends that due process requires involuntary statements made to law enforcement during a custodial interrogation be excluded in involuntary commitment hearings. J.M. also contends that to "determine . . . the proper scope of due process protections in civil commitment hearings" the *Mathews v. Eldridge* balancing test must be applied. Br. of Appellant at 15; *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed 2d 18 (1976).

To determine what process is due, courts generally apply the test enunciated in *Mathews v. Eldridge*. *In re Det. of Law*, 146 Wn. App. 28, 43, 204 P.3d 230 (2008), *review denied*, 165 Wn.2d 1028 (2009). However, as reasoned in the United State Supreme Court's decision in *Allen v. Illinois*, 478 U.S. 364, 374, 106 S. Ct. 2988, 92 L. Ed. 2d 296 (1986), the *Mathews v. Eldridge* balancing test is not applicable in an involuntary commitment proceeding because such a proceeding is not criminal in nature and due process does not require application of the Fifth Amendment in an involuntary commitment proceeding.

In *Allen*, the appellant made self-incriminating statements to a psychiatrist that were then used in proceedings to determine whether the appellant was a sexually dangerous person under the Illinois Sexually Dangers Persons Act (ISDPA). 478 U.S. at 366. The appellant argued that

---

practical and identifiable consequences in the trial of the case.'" *Id.* (internal quotation marks omitted) (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)).

Here, the issue as presented has a constitutional dimension because J.M. argues that his due process rights were affected due to a violation of his Fifth Amendment right to remain silent. But the admission of the statements to Officer Wilson do not have practical and identifiable consequences in the case and is a constitutionally harmless error because J.M. made the same statements to other individuals who were not law enforcement.

No. 54144-1-II

admission of the self-incriminating statements violated his Fifth Amendment right against self-incrimination. *Id.* at 368

> The Court in *Allen* acknowledged that the privilege against self-incrimination
>
> "not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."

*Id.* (internal quotations omitted) (quoting *Minnesota v. Murphy,* 465 U.S. 420, 426, 104 S. Ct. 1136, 1141, 79 L. Ed. 2d 409 (1984)).  However, the Court held that the proceedings under the ISDPA were not criminal within the meaning of the Fifth Amendment because the State's intention was "to provide 'care and treatment for persons adjudged sexually dangerous designed to effect recovery.'"  *Id.* at 369 (quoting Ill. Rev. Stat. ch. 38, ¶ 105-8 (1973)).

Under the ISDPA, patients were sent to a facility "set aside to provide psychiatric care." *Id.*  Further, patients who were found to be no longer dangerous could be discharged.  *Id.* Therefore, the purpose of the ISDPA was to provide treatment, not punishment, for persons adjudged sexually dangerous, not to promote "'the traditional aims of punishment-retribution and deterrence.'"  *Id.* at 370 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168, 83 S. Ct. 554, 567, 9 L. Ed. 2d 644 (1963)).

The Court also rejected the argument that even if the commitment proceeding was not criminal, the guarantee of due process under the Fourteenth Amendment required application of the privilege, stating that "[t]his Court has never held that the Due Process Clause of its own force requires application of the privilege against self-incrimination in a noncriminal proceeding, where the privilege claimant is protected against his compelled answers in any subsequent criminal case.

11

No. 54144-1-II

We decline to do so today." *Id.* at 374. Thus, the Court declined to apply *Mathews v. Eldridge*. *Id.* at 374-75. According to the Court, ISDPA proceedings were not "criminal" within the meaning of the Fifth Amendment to the United States Constitution, and the Fourteenth Amendment's guarantee of due process did not require application of the Fifth Amendment's privilege against self-incrimination to proceedings under the ISDPA. *Id.* at 375.

Here, like the ISDPA, chapter 71.05 RCW is intended, among other things, "[t]o protect the health and safety of persons suffering from [behavioral health] disorders," "[t]o prevent inappropriate, indefinite commitment of [behaviorally] disordered persons," "[t]o provide prompt evaluation and timely and appropriate treatment of persons with serious [behavioral health] disorders," and "[t]o provide continuity of care for persons with serious [behavioral health] disorders." Former RCW 71.05.010(1)(a), (b), (c), (e) (2016). Further, like the facilities in the ISDPA, individuals who are involuntarily committed are released to "the custody of the department of social and health services" or sent to a facility that is certified for either 90 day or 180 day treatment. Former RCW 71.05.320(1)(a), (1)(c), (2) (2018).

In addition, an involuntarily committed individual can be released in a number of ways. Generally, an individual is released from involuntary treatment at the expiration of the commitment period. Former RCW 71.05.320(4). However, an involuntarily committed individual may be permitted to leave the facility "for prescribed periods during the term of the person's detention, under such conditions as may be appropriate." RCW 71.05.270. Further, an individual may be released early from involuntary treatment if an authorized individual determines that "the person being involuntarily treated no longer presents a likelihood of serious harm." RCW

12

No. 54144-1-II

71.05.330(1). Also, the authorized individual can release the involuntarily committed individual to outpatient treatment prior to the expiration of the commitment period if the involuntarily committed individual is deemed fit. Former RCW 71.05.340(1)(a) (2018).

Like the commitment proceedings under the Illinois statutory scheme addressed by the Court in *Allen*, involuntary commitment proceedings under Washington's statutory scheme are not criminal within the meaning of the Fifth Amendment.[6] Therefore, just as the Court held in *Allen*, we decline to apply *Matthews v. Eldridge* and hold that the Fifth Amendment privilege against self-incrimination does not apply in an involuntary commitment hearing and that J.M.'s due process rights were not violated by the admission of the statements he made to law enforcement.[7]

D.      BEST EVIDENCE RULE

JM argues that the testimony about the contents of the Facebook messages violated the best evidence rule because the messages were not offered or admitted at the hearing. The State

---

[6] J.M. points to *Law* to argue that our court has "implied that a 'voluntariness inquiry' applies whenever a confession is obtained during a custodial interrogation with the intent to use the confession in a criminal prosecution." Br. of Appellant at 11. However, as discussed above, involuntary commitment proceedings are not criminal within the meaning of the Fifth Amendment. Moreover, the court in *Law* acknowledged that the Fifth Amendment right against self-incrimination does not apply to SVP civil proceedings but noted that Law did not challenge the court's ruling on Fifth Amendment grounds. *Law*, 146 Wn. App. at 42-43. J.M.'s reliance on *Law* is unpersuasive.

[7] Moreover, regardless of whether J.M.'s statements to law enforcement violated his constitutional right against self-incrimination, there was overwhelming untainted evidence of J.M.'s statements to others. The State presented testimony from multiple witnesses, including Melvin and Ranney, who stated that J.M. admitted to stealing items at the store in order to resell them to buy a gun so that he could shoot his "ex-girlfriend's" boyfriend.

No. 54144-1-II

concedes that admission of the testimony about the contents of the Facebook messages violated the best evidence rule. We accept the State's concession.

We review a trial court's decision to admit evidence for abuse of discretion. *State v. Clark*, 187 Wn.2d 641, 648, 389 P.3d 462 (2017). A trial court abuses its discretion when its decision is based on untenable grounds or reasons. *State v. Bessey*, 191 Wn. App. 1, 6, 361 P.3d 763 (2015). We defer to a trial court's decision unless no reasonable person would adopt the trial court's view. *Clark*, 187 Wn.2d at 648.

Under the best evidence rule, the original writing is required to prove the content of the writing. ER 1002. The original writing does not need to be produced if it is "unavailable 'for some reason other than the serious fault of the proponent.'" *State v. Fricks*, 91 Wn.2d 391, 397, 588 P.2d 1328 (1979) (quoting MCCORMICK'S HANDBOOK ON THE LAW OF EVIDENCE § 230, at 560 (Edward W. Cleary ed., 2d ed. 1972)). If a party fails to produce a document or make any showing of its unavailability, testimony as to its contents is not an acceptable method of proof. *Id.*

Evidence admitted in violation of the rules of evidence is not a reversible error if it is a harmless error. *State v. Ashley*, 186 Wn.2d 32, 47, 375 P.3d 673 (2016). Erroneous admission of evidence is harmless unless there is a reasonable probability that, but for the error, the verdict would have been materially different. *Id.*

Here, Hornbeck testified about the content of Facebook messages as it related to the felony harassment charge against J.M. J.M. objected to Hornbeck's testimony, arguing that the testimony violated the best evidence rule. The State replied, "I'm asking the witness what the respondent—what he communicated to her, what she has described as a threat." VRP (Nov. 25, 2019) at 52.

14

No. 54144-1-II

The trial court stated, "I'll allow the threat. That's as far as I'm going." VRP (Nov. 25, 2019) at 53.

Hornbeck testified as to the exact contents of J.M.'s Facebook messages. The State intended for Hornbeck's testimony to establish J.M.'s threat. But the State never moved to admit J.M.'s Facebook messages. The actual Facebook messages should have been offered and entered into evidence because the State was attempting to establish that J.M. communicated in writing a threat intending to kill anyone who stood in the way of him and his "ex-girlfriend." Further, the State did not offer an explanation as to why the messages were unavailable. *See Fricks*, 91 Wn.2d at 397. Instead, the State merely relied on, and the trial court improperly allowed, Hornbeck's testimony to prove the contents of the Facebook message. *See id.* Therefore, the trial court abused its discretion in admitting the testimony into evidence.

The erroneous admission of Hornbeck's testimony about the contents of J.M.'s Facebook messages was not a harmless error because it was the only evidence offered to support the allegation that J.M committed felony harassment by threatening to kill. But the erroneous admission of Hornbeck's testimony does not affect the validity of the involuntary commitment order because J.M. was also found to have committed the felony of theft with intent to resell.[8]

---

[8] In the case of civil commitment, the trial court considers prior civil commitments. *In re Det. of M.K.*, 168 Wn. App. 621, 626, 279 P.3d 897 (2012). As a result, each prior commitment is evidence against an individual seeking denial of a petition for civil commitment. *Id.* Therefore, "each commitment order has a collateral consequence in subsequent petitions and hearings." *Id.* Because a trial court may consider prior commitment orders, we address the best evidence rule issue regardless of whether J.M. could be committed on other grounds. *See id.* at 629-30.

No. 54144-1-II

However, we remand to the trial court to strike references to felony harassment in the involuntary commitment order. *See In re Det. of M.K.*, 168 Wn. App. 621, 626, 629-30, 279 P.3d 897 (2012).

CONCLUSION

We hold that the trial court provided sufficiently specific findings to provide a meaningful review; J.M.'s statements made to law enforcement are not covered by former RCW 71.05.360(8)(d) because the statements were not made by J.M. during the involuntary commitment hearing; J.M.'s due process rights were not violated by the admission of the statements he made to law enforcement; and the trial court erred in admitting Hornbeck's testimony about the contents of J.M.'s Facebook messages, but the erroneous admission of Hornbeck's testimony does not affect the validity of the involuntary commitment order because J.M. was also found to have committed the felony of theft with intent to resell. Therefore, we affirm the trial court's order committing J.M. for 180 days of involuntary commitment but remand for the trial court to strike references to felony harassment in the involuntary commitment order.

_____, C.J.
Lee, C.J.

We concur:

_____
Worswick, J.

_____
Glasgow, J.

16