# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of: | No. 56415-7-II |
| ARON LEE NIXON, | |
| Petitioner. | UNPUBLISHED OPINION |

VELJACIC, J. — Aron Nixon appeals the jury's determination that he is a sexually violent predator (SVP).  Nixon argues that (1) the State lacked statutory authority to file a civil commitment petition against him and that the trial court erred by (2) excluding evidence to impeach a non-testifying declarant, (3) excluding an admission of a party opponent, (4) preventing him from arguing that the threat of a recent overt act was an added deterrent to commission of a future sexual offense, (5) holding numerous in-chambers proceedings in violation of the public trial right, (6) preventing him from arguing that a presumption of innocence exists in civil commitment proceedings, and finally (7) Nixon argues that the cumulative error doctrine requires reversal.  We affirm.

FACTS

## I.    BACKGROUND FACTS AND GUILTY PLEA TO CRIMINAL CHARGES

In 2017, J.S. alleged that Nixon held him captive at a homeless encampment and assaulted him sexually and physically.  Based on J.S.'s allegations, the State charged Nixon with the following crimes: rape in the first degree by means of forcible compulsion with a deadly weapon,

kidnapping in the first degree with sexual motivation, assault in the second degree with sexual motivation, and felony harassment with sexual motivation.

The trial court granted Nixon's request to depose J.S. In October 2018, the State moved to amend the information, charging Nixon with assault in the second degree, rape in the third degree, and felony harassment. The amended information removed allegations of sexual motivation relevant to the charges of assault in the second degree and felony harassment. The State explained the reasons for the amendment, writing that "[d]uring the deposition [of J.S.], information came to light that might cause a jury to have doubts about [J.S.'s] credibility and account of events." Clerk's Papers (CP) at 89. The State further explained that "[t]here are inconsistencies and memory issues in [J.S.'s] account of his actions prior to [Nixon's] assault as well as in the account of the assault itself." CP at 89. Additionally, the State explained that "[w]itnesses who were present prior to the assault are homeless and are unlikely to be located for trial." CP at 89.

The amended information permitted for a resolution that "secures three felony convictions, two strike offenses, a prison sentence, three years of supervision, and a requirement that [Nixon] register as a sex offender after release." CP at 89-90. The trial court accepted the amendment and accepted Nixon's guilty plea to all charges.[1] In a statement, Nixon admitted the following:

> On or around June 24, 2017 through June 27, 2017, in Pierce County WA, I engaged in sexual intercourse with J.S., where J.S. did not consent to sexual intercourse and such lack of consent was clearly expressed by J.S.'s words and/or conduct. At the same time and place, I threatened to kill J.S., and by my words or conduct placed him in reasonable fear that the threat would be carried out and I also intentionally assaulted J.S. and inflicted substantial bodily harm. I struck J.S. and knocked his tooth out.

CP at 100. Nixon served 26.75 months in prison.

---

[1] None of the offenses to which Nixon pleaded guilty constitute sexually violent offenses. *See* RCW 71.09.020(18).

II.     CIVIL COMMITMENT PETITION

In October 2019, the State filed a civil commitment petition, alleging that Nixon was an SVP. The State alleged that Nixon's 2017 conviction for assault in the second degree qualified as a sexually violent offense. The State explained that it would prove the offense was committed with sexual motivation at trial. Nixon moved to dismiss the petition, arguing that the State lacked authority to initiate the action because sexual motivation was not proven in the underlying criminal trial. The trial court rejected Nixon's argument, holding that the statute explicitly permits sexual motivation to be determined at a subsequent civil commitment trial. The trial court found probable cause to believe Nixon was an SVP. This court denied discretionary review of the trial court's denial of Nixon's motion to dismiss. *See* Ruling Denying Discr. Rev., *State v. Nixon*, No. 54398-2-II (Wash. Ct. App. Apr. 24, 2020).

III.    MOTIONS IN LIMINE

Before trial started, Nixon moved in limine for a ruling that, as a matter of law, a presumption existed "that [Nixon] does not meet the commitment criteria unless such a presumption is overcome by evidence beyond a reasonable doubt." CP at 224. The State responded, arguing that no presumption against commitment exists in SVP cases because they are civil. The trial court denied Nixon's motion.

The State moved in limine to preclude Nixon from presenting evidence and argument that he was aware that he could be subjected to an SVP petition based on the commission of a "recent overt act," and that such knowledge sufficiently deterred him from committing an act of predatory sexual violence. CP at 283. The State argued that such evidence was not relevant because Nixon

had "explicitly stated in his deposition that he had total control over his behavior and his risk to reoffend was zero." CP at 284 (footnotes omitted).[2]

During Nixon's deposition, Nixon testified on several occasions that his risk to reoffend was zero because he viewed himself as a "10 out of 10" for "sexual control" and that it had "always been a 10 out of 10." CP at 362. Next, as to his likelihood of committing a sex offense, Nixon testified, "*I would like to say that it is zero*. I know that anything is possible, as it is for anybody else, but *I've not committed a sex offense in the past, and it is my intent to not commit any crimes at all*. So I would like to say that it's a zero." CP at 363 (emphasis added).

The State then asked if Nixon had "heard of the term 'recent overt act?'" CP at 363. Nixon responded that he had, adding that he believed his risk of committing a sex offense is zero "because it is [his] intention not to commit any crime." CP at 363.

> [STATE:] Okay. And because it's not your intention to commit any crime, whether or not the State can—can file a new petition based on a recent overt act, that wouldn't have any influence on sort of how you act; is that right?
> . . . .
> [NIXON:] I am—I am aware of that. That is—that is—that is—*that is definitely an added deterrent*. But I also know that it's not my intention, whether that is there or— or not. But *I do understand that if I am released that I don't even have to commit a crime, that I could still be put back into this same position again, and it is not my intention to go down that path at all*.

---

[2] A recent overt act is defined as "any act, threat, or combination thereof that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act or behaviors." RCW 71.09.020(13). Pursuant to RCW 71.09.030(1)(e), an SVP petition may be filed against "a person who at any time previously has been convicted of a sexually violent offense and has since been released from total confinement and has committed a recent overt act." RCW 71.09.030(e) was amended, effective July, 2023. The amendments are immaterial to the legal issues in this case.

CP at 363-64 (emphasis added). Nixon then testified again that the fact that a recent overt act alone could form the basis for a new petition for commitment was "*an added deterrent* so that I would not veer off of my—my path." CP at 364 (emphasis added).

The trial court heard argument from both parties, including the State's argument that Nixon had testified that he had complete control of his sexual behaviors and he denied having committed any sexual offense. Nixon's counsel did not deny the State's characterization of Nixon's testimony as having stated he had zero risk to commit a sexual offense. The trial court granted the State's motion to exclude evidence relevant to recent overt acts.

IV.    CIVIL COMMITMENT TRIAL

A.    Trial Testimony Regarding 2017 Assault

J.S. did not testify at the civil commitment trial. The State called witnesses who testified to J.S.'s statements concerning the 2017 assault.

Victor Jason Harris, a firefighter and paramedic for Central Pierce Fire and Rescue, testified that on June 27, 2017 he responded to a call in North Meridian. Harris encountered J.S. who appeared "tearful . . . . scared and anxious." 9 Rep. of Proc. (RP) at 1065. J.S. told Harris that he was trapped in a homeless camp for three days and "raped repeatedly." 9 RP at 1067. J.S. reported that he was held in a tent and could not leave without being beaten.

Robert Kearney, a police officer for the City of Puyallup, contacted J.S. on June 27, 2017. J.S. appeared to be in shock. J.S. told Kearney that Nixon had physically and sexually assaulted him. J.S. reported that Nixon restrained him with chains on his wrists, put peanut butter on his face and bit his cheek, chin, tongue, and ear, and stated that J.S. "tasted like elk." 9 RP at 1088. Nixon also broke one of J.S.'s teeth. J.S. told Kearney that Nixon burned him with a cigarette, slept on him to ensure he would not run away, and rubbed knives on him.

5

Jessica Dube, a sexual assault nurse examiner (SANE), examined J.S.  Dube testified that J.S. told her that a man named "'Aron, black male, maybe late to mid-thirties, tall guy,'" assaulted him.  10 RP at 1198.  J.S. told Dube that Nixon bit his check, eye socket, nose, and tongue.  He also burned J.S.'s forearms and kicked him "'in the back of the ribs, stomach, face, [and] head.'"  10 RP at 1197.  Nixon also punched, kicked, and raped J.S.  J.S. stated that Nixon rubbed knives and razor blades over J.S.'s skin.  He also informed Dube that a knife, razor blade, and scalpel were involved in the attack.

> [STATE:]  Did you ask him whether there was penetration of mouth by penis?
> [DUBE:]  Yes.  And he answered "yes."
> [STATE:]  Did you ask him if there was a foreign object involved?
> [DUBE:]  Yes.  And he answered ["]yes.["]  "Yeah, a knife, a razor blade, and a scalpel and his finger pulling my teeth out."

10 RP at 1199.  J.S. told Dube that Nixon had "'licked [him] all the time.'"  10 RP at 1200.  J.S. further stated that Nixon put him on his back when raping him and penetrated his anus with Nixon's penis.

Puyallup Police Detective Shelby Wilcox, the lead detective on the case, conducted two interviews with J.S. as noted in incident reports that she completed.  Wilcox wrote in one report that J.S. reported that he was lured into a homeless camp.  J.S. told Wilcox that "over the past 24-30 hours he was punched and kicked and told not to fight back."  Ex. 160, at 617.  J.S. stated that Nixon punched him in the face, beat him, placed chains on J.S.'s wrists, and blindfolded him.  J.S. also reported that Nixon ate peanut butter off J.S.'s face and told him that "humans taste like elk."  Ex. 160, at 618.  Nixon burnt J.S.'s forearm and removed one of his teeth, which was a dental implant.  J.S. reported that Nixon used a knife during the attack.  J.S. told Wilcox that Nixon sexually assaulted him "one time during the incident."  Ex. 160, at 618.

During the civil commitment trial, Nixon sought to use J.S.'s statements made to Wilcox to impeach J.S.'s hearsay statements to other witnesses. Specifically, the jury heard that J.S. told Harris that he was raped repeatedly, but J.S. informed Wilcox that he was raped only once. The jury also heard that J.S. told Harris that he was trapped for a total of three days, but J.S. indicated to Wilcox that he was held for less than 30 hours. Finally, J.S. told Wilcox that a knife was used in the attack, but stated to Dube that a knife, a razor blade, and a scalpel were used. The trial court denied Nixon's request to introduce evidence of the inconsistent statements made to Wilcox.

Jennifer Hayden, a forensic scientist with the Washington State Patrol Crime Laboratory, performed DNA analysis on the rape kit obtained from J.S., including a penile swab. The majority of DNA from sperm fractions[3] found on J.S.'s penile and perineal swabs was consistent with Nixon's DNA.

Erik Fox, Ph.D., a forensic psychologist, testified that Nixon suffered from antisocial personality disorder. Dr. Fox examined the police reports, hospital records, and photographs of J.S.'s physical condition when he was hospitalized, as well as video and audio recordings. Relevant to his opinion, Dr. Fox considered that J.S. "was held captive in the tent, he was essentially tortured for an extended period of time. [Nixon] didn't allow him to escape. He slept on top of the victim so that he couldn't move and get away. He threatened the victim's life." 12 RP at 1534. He also considered the fact that Nixon had put peanut butter on J.S. and then chewed on J.S.'s face and near his eye and had stated that humans tasted like elk, committed rape against J.S., burnt J.S., ejaculated in J.S.'s mouth, rubbed a knife on J.S., and bound J.S. with chains.

---

[3] Hayden explained the meaning of the term "sperm fraction," stating that that when she suspects the presence of semen in a sample she uses a type of extraction which "utilizes the hardiness of sperm cells to take a single sample and separate out the sperm cells from the non-sperm cells to create two separate samples, which we term a sperm fraction and a non-sperm. So in the sperm fraction, theoretically it's going to be just the sperm cell DNA." 16 RP at 2200.

On cross-examination, Nixon asked Dr. Fox about a number of inconsistencies in J.S.'s statements made to Wilcox, including the timeline of events leading to meeting Nixon. After this questioning, counsel asked Dr. Fox whether he was required to have a clear understanding of what happened in order to form an opinion. Dr. Fox responded that he looked to the "totality of the record" and "focused on was the man raped, was he tortured, was he kidnapped. Those are the things that are relevant to me." 13 RP at 1678. For example, Fox acknowledged that J.S. was not held captive on June 24 or June 25 even though he stated that he was held captive during that time to Wilcox. On redirect, Dr. Fox stated that inconsistencies in J.S.'s version of events did not affect his opinions as "[he] didn't find that they were important enough to impact [his] ultimate decision." 14 RP at 1848.

Amy Phenix, Ph.D., a clinical psychologist, testified that she believed Nixon raped J.S. In her report, Dr. Phenix listed the factual details of what she believed occurred and that assisted her in formulating her opinion. Dr. Phenix believed that Nixon held J.S. captive, chewed on J.S., removed J.S.'s tooth, ate peanut butter off of J.S., and bit and chewed on his flesh. Dr. Phenix also considered that Nixon had penetrated J.S.'s mouth with his penis and kept a knife to his neck.

B.      Testimony Regarding Uncharged Sex Offenses

In further testimony at the trial, other witnesses testified to uncharged sex offenses allegedly committed by Nixon, which Nixon denied. In 1988, at age 13, Nixon was investigated for sexual abuse of his younger sister and brother. Nixon admitted that he had sexual contact with each of his siblings approximately ten times. Nixon provided a handwritten statement to the Tacoma Police Department admitting to the sexual contact, and he pleaded guilty to simple assault.

S.S., an adult woman who was in a relationship with Nixon, testified in a video deposition played at trial that Nixon vaginally raped her. She also testified that Nixon anally raped her after

8

she went to rescue her puppy that he threatened to kill. On another occasion, Nixon physically attacked her when she was pregnant. According to S.S., Nixon woke her up and choked her and during the attack bent the metal bedframe due to the amount of force he used. He then tackled her and smashed her head into the carpet. Nixon also threatened to kill S.S., kill her baby, and also threatened her mother. S.S. obtained a permanent protection order against Nixon.

C.R., an adult woman, dated Nixon. Jessica Sericolo, a registered nurse and clinical nurse manager, who also formerly worked as a forensic SANE, performed a SANE evaluation of C.R. In 2016, C.R. reported to Sericolo that Nixon had dragged her to his camp and became violent toward her. C.R. attempted to get away from Nixon approximately 20 times, but he kept grabbing her and throwing her down, preventing her from leaving his tent. Nixon groped C.R. repeatedly over her jeans and between her legs. According to C.R., Nixon had knives and an ax out during the attack. Nixon threatened to kill C.R., jumped on her, and bit her twice on the lip. Sericolo documented 23 bruises on C.R. and found external genital injuries on C.R. as well. Nixon was never charged as a result of C.R.'s report.

C.     Closed In-Chambers Meetings that Appear on the Record

During the course of trial, the trial court held numerous in-chambers proceedings. All of the 14 in-chambers proceedings were simultaneously recorded by the court reporter. Two of the proceedings occurred once the jury had been excused from the courtroom.

1.     Closure for GR 37 Challenge

While in open court, the State told the trial court that it wished to lodge a GR 37 objection to one of Nixon's peremptory challenges. The trial court asked if a proceeding needed to be held in chambers, and the State responded "yes." In chambers, Nixon's counsel stated that he wanted to use a peremptory challenge to strike a person of color from the venire panel. Nixon's counsel

explained that he had a numbering system, which showed him that the juror scored as highly undesirable to be a juror on the panel. The trial court denied the GR 37 challenge.

At the end of the meeting, the trial court informed the parties that further motions or rulings that were necessary during voir dire would be addressed in one meeting, explaining, "[t]his is just not a good situation. We've got too many jurors and nowhere to put them, so we have to leave the courtroom, but we can't do this every time." 2 RP at 943.

### 2. The Remaining Closures

There were 13 other closures. Of the 13 closures, the trial court ruled in Nixon's favor on all but two.

The first of the rulings against Nixon concerned the State's hearsay objection regarding impeachment evidence in the form of J.S.'s statements to Wilcox. Nixon asked Wilcox about statements made by J.S. in order to impeach statements made to other witnesses. In open court, the following colloquy occurred:

> [NIXON'S COUNSEL]: In the recorded interview, in the interview that you had, [J.S.] told you that his friend named Derrick drove from Lake Stevens area to watch Roger Waters/Pink Floyd concert, correct?
> [STATE]: Your Honor, objection. Hearsay unless he's opening the door to get everything that [J.S.] said in, so I—I'm just saying.
> [NIXON'S COUNSEL]: This is impeachment, Your Honor, so according to ER 806, when hearsay has been admitted, the declarant can be impeached as if the declarant had taken the stand.
> [STATE]: I have not asked her any statements that [J.S.] said to her.
> [NIXON'S COUNSEL]: It doesn't matter. [J.S.'s] testimony has come from other witnesses and they were offered for the truth of the matter asserted.
> [STATE]: Not from the State.
> THE COURT: Can I see both of you in chambers, please?

11 RP at 1292-93.

In chambers, the parties argued whether Nixon had the right to impeach J.S.'s statements made to other witnesses through Wilcox's testimony under ER 806. The trial court ruled in the

10

State's favor, holding that Nixon could not impeach J.S. through Wilcox's testimony, because Wilcox had not testified regarding any inconsistent statements.

At the end of the in-chambers proceedings, the State told the trial court, "I think we need to put all these arguments on the record in open court." 11 RP at 1305. The conversation was not immediately summarized in open court. Later, after the jury and Wilcox had left the court room, the trial court asked the State if it would like to make a record "about our sidebar this morning." 11 RP at 1327. The State responded affirmatively and stated the following:

> I just wanted to say it in open court if anyone was present that I objected to [Nixon's] cross-examining about Detective Wilcox about [sic] statements that he made that [J.S.] made to her under hearsay. We had a conversation in chambers. [Nixon] was invoking ER 806. The Court agreed with the State in that he could not cross-examine . . . Detective Wilcox about any statements [J.S.] made to her because I had not questioned her about any statements that were made, so it became hearsay.

11 RP at 1328. Nixon's counsel then made an offer of proof.

The second ruling against Nixon concerned cross-examination of Cheryl Borden regarding bias and citizen complaints.

Two in-chambers proceedings occurred regarding the scope of Nixon's cross-examination of Borden, owner of Hope Human Services, a company that provides residential services to adults and children who have developmental disabilities, and former director of day-to-day operations at New Hope Resource Center, a day-time drop in center.

During direct examination, Borden testified to observations and interactions that she had with Nixon at New Hope Resource Center. On cross-examination, Nixon asked Borden if all the income of her organization comes from a contract with the Department of Social and Health Services (DSHS). Borden answered that it did. Nixon then asked if DSHS also runs the Special Commitment Center. The State objected based on relevance and speculation. Nixon offered to

11

make a record at sidebar and the trial court and counsel went into chambers. In chambers, Nixon stated that the objection related to bias as Borden's livelihood depended on the cooperation of DSHS, and Borden therefore had reason to testify favorably with regard to DSHS, the agency that also runs the Special Commitment Center. The State requested that the line of questioning not continue. The trial court permitted Nixon to repeat that final question but stated that it would sustain objections to further questioning.

During cross-examination of Borden, the State objected to Nixon's questions regarding the number of citizen complaints received by New Hope Resource Center. The State objected based on motions in limine and relevance and asked to be heard outside the jury's presence in order to provide additional context. Nixon also stated that a sidebar should be taken. The trial court excused the jury for morning recess and counsel and the trial court went to chambers. In chambers, Nixon argued that the motions in limine were not a basis for excluding the line of questioning and the trial court agreed that the specific motion in limine did not pertain to the line of questioning at issue. As for relevance, Nixon argued that the State sought to portray complaints against Nixon as "somehow special," however, "[t]here are lots of other complaints about other guests . . . and that's all I'm trying to point out." 15 RP at 1966-67. The trial court overruled the relevance objection, permitting Nixon to continue with his questioning. The arguments heard in chambers were not summarized in court. Nixon repeated the same question, asking Borden if New Hope Resources Center received a lot of citizen complaints.

3. Trial Court's Reason For Closures

After admission of all the evidence and outside the jury's presence, the trial explained its reasoning for conducting sidebars in chambers versus in the courtroom.

> We have had a number of sidebars where I've taken counsel from both sides into
> the judicial assistant's chambers. We have 15 jurors seated right now. That's 12

jurors and three alternates. We're in pandemic conditions, and to excuse this jury into a single jury room puts 15 people into a very small space.

We are currently using my jury room and the jury room in another department for these jurors every time they break. It's a health-related issue. It's an issue of comfort for these jurors and it's an issue, frankly, of responsibility, not leaving these people every time we have a discussion in an enclosed quarter, masked and bumping against each other. We have not had a discussion of any substantive issue outside the presence of a court reporter in chambers.

Now, that said, we have taken questions from the jury and I have taken counsel back into chambers without the court reporter so that they could read the questions and we could have a very brief discussion about whether the questions were admissible or not, and that has occurred each time we've had a question from the jury. That is the only time that we've been outside the presence of a court reporter.

20 RP at 2662-63. Nixon agreed with the State's description of the facts regarding the meetings that occurred in chambers.

D.      Denial of Nixon's Request for Missing Witness Instruction

The State initially listed J.S. as a witness, but rested its case without calling him. Nixon requested a missing witness instruction, arguing that the jury should be permitted to presume that J.S.'s testimony would have been adverse to the State. Nixon argued that J.S. was a "logical witness" for the State as it had the burden to prove that assault in the second degree occurred with sexual motivation. 20 RP at 2644-45. Nixon argued that J.S. was the only witness, apart from Nixon to the events underlying the case. The State explained:

[W]e have a practice of not forcing victims to testify. We call victims, you know, sometimes—well, like Ms. Smith; you know, it happened to her 15 years ago. We gave her the choice to testify. We never force victims to testify. And more than purposes, we don't want to retraumatize them. And—and, obviously, [J.S.] would have been retraumatized in this case. So it's different from criminal. We don't have to call them in these cases.

20 RP at 2652-53.

13

The trial court denied Nixon's request for a missing witness instruction, stating: "I'm not giving the missing person instruction after contemplating this issue and reading the case law. I just want to make the record clear. I do not believe it's warranted." 20 RP at 2664.

### D. Nixon Testifies that the Relationship with J.S. was Consensual

Nixon testified in his own defense. Nixon denied any claims of sexual assault, explaining that he had only had consensual sexual relationships, including the relationship with J.S.

## V. VERDICT

The jury found that the State had proven that Nixon was an SVP beyond a reasonable doubt. The trial court entered an order committing Nixon to the Special Commitment Center.

Nixon appeals.

## ANALYSIS

## I. THE STATE'S AUTHORITY TO FILE A CIVIL COMMITMENT PETITION

Nixon argues that he did not have a previous conviction for a sexually violent offense, and therefore, under RCW 71.09.030(1),[4] the State lacked authority to file a civil commitment petition in this case. The State responds that RCW 71.09.030(1) must be read in conjunction with RCW 71.09.020(18)(c), and when read together, the statutes establish that evidence of a sexually violent offense may be proven subsequently during civil commitment proceedings initiated under chapter 71.09 RCW. We agree with the State.

We review issues of statutory construction de novo. *In re Det. of Martin*, 163 Wn.2d 501, 506, 182 P.3d 951 (2008). Our "fundamental objective is to ascertain and carry out the legislature's intent." *Broughton Lumber Co. v. BNSF Ry. Co.*, 174 Wn.2d 619, 625, 278 P.3d 173

---

[4] This statute was amended, effective July, 2023. However, the amendments are immaterial to the legal issues in this case.

(2012). In order to determine the legislature's intent, we begin by reviewing the plain language of the statute. *Tesoro Refining & Mktg. Co. v. Dept. of Revenue*, 173 Wn.2d 551, 556, 269 P.3d 1013 (2012). In reviewing the plain language, we do not read any provision in isolation, but rather look to the statutory scheme as a whole. *Dept. of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002).

The filing of a civil commitment petition is governed by RCW 71.09.030(1)(a), which provides:

> A [sexually violent predator petition] may be filed alleging that a person is a sexually violent predator and stating sufficient facts to support such allegation when it appears that: (a) *A person who at any time previously has been convicted of a sexually violent offense* is about to be released from total confinement.

(Emphasis added.)

The definition of sexually violent offense includes

> assault in the first or second degree . . . which act, either at the time of sentencing for the offense or *subsequently during civil commitment proceedings pursuant to this chapter,* has been determined beyond a reasonable doubt to have been sexually motivated, as that term is defined in RCW 9.94A.030.

RCW 71.09.020(18) (emphasis added).

In *Abolafya v. State*, Division One of this court determined that sexual motivation of a crime for purposes of the SVP statute "may be prove[n] either at the criminal trial for the original conviction, *or subsequently* during the civil commitment proceedings." 114 Wn. App. 137, 144, 56 P.3d 608 (2002) (emphasis added). In *In re Detention of Mines*, Division Three of this court similarly stated that the statutory language of the SVP statute is plain on its face as it provides that "[s]exual motivation is explicitly permitted to be subsequently determined during the SVP trial." 165 Wn. App. 112, 121, 266 P.3d 242 (2011).

15

Nixon urges this panel not to follow the other opinions from this court and argues that, pursuant to RCW 71.09.020(18), at a civil commitment trial, the State "may rely on proof of other acts that are not convictions." Br. of Appellant at 55-56. He argues that RCW 71.09.020(18) does not, however, expand the State's filing authority.

A determination that a sexually violent offense may not be subsequently proven at a civil commitment proceeding would require us to read RCW 71.09.030(1)(a) in isolation from RCW 71.09.020(18). Pursuant to the statutory definition of a sexually violent offense, sexual motivation may be proven subsequently during civil commitment proceedings. RCW 71.09.020(18). Because sexual motivation may be proven at a subsequent civil commitment proceeding, we conclude that the State had the statutory authority under chapter 71.09 RCW to file the civil commitment petition at issue in this case.

II.      ER 806 IMPEACHMENT EVIDENCE

Nixon argues that the trial court erred when it refused to permit him to impeach J.S.'s hearsay statements by introducing inconsistent statements made by J.S. to Wilcox. The State acknowledges that exclusion of the evidence should be deemed erroneous, but argues that the error was harmless because "ample evidence supports that Nixon committed the assault against J.S. with sexual motivation, and Nixon's trial counsel cross-examined the State's expert about J.S.'s inconsistent statements." Br. of Resp't at 38. We agree with the State.

A.      The Trial Court Erred by Barring Introduction of Inconsistent Statements to Impeach J.S.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay is generally inadmissible unless provided by the rules of evidence, other court rules, or statute. ER 802.

16

ER 806, which governs attacking and supporting the credibility of a declarant, provides:

> When a hearsay statement, or a statement defined in rule 801(d)(2)(iii), (iv), or (v), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, *by any evidence which would be admissible for those purposes if declarant had testified as a witness*. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross examination.

(Emphasis added.) "A party may impeach a witness using a prior inconsistent statement." *Fite v. Mudd*, 19 Wn. App. 2d 917, 938, 498 P.3d 538 (2021), *review denied*, 200 Wn.2d 1004 (2022).

Here, the trial court excluded the inconsistent statements made to Wilcox, agreeing with the State's argument that unless a witness testified to statements made by a declarant on direct examination, that witness could not testify to any inconsistent statements. Nonetheless, the State introduced hearsay statements made by J.S and, therefore, Nixon had the right to impeach J.S. "by *any* evidence which would be admissible for those purposes if [J.S.] had testified as a witness." ER 806 (emphasis added). This evidence included prior inconsistent statements. The State concedes that nothing in ER 806 limits impeachment evidence of a non-testifying declarant to statements from a witness who first testified regarding the declarant's hearsay statements. Because ER 806 permitted the introduction of J.S.'s inconsistent statements through Wilcox, we accept the State's concession and hold that the trial court erred in denying Nixon the opportunity to impeach J.S.'s statements.

B.      Harmless Error

Next, we must decide if the trial court's error was harmless. Nixon argues that the impeachment evidence likely would have had a material effect on the outcome of the trial because the evidence would have undermined J.S.'s credibility. He argues that credibility determinations

by the jury were important as Nixon claimed that the sexual encounter was consensual, which was directly opposed to J.S.'s version of events. Nixon also argues that the State relied on J.S.'s hearsay statements to prove that the assault in the second degree was sexually motivated. The State responds that the error was harmless because (1) none of the allegedly inconsistent statements challenged the allegation of sexual motivation, (2) "extensive evidence supports that the assault was sexually motivated," and (3) Nixon's counsel cross-examined the State's expert, Dr. Fox, regarding inconsistencies in J.S.'s statements.

An evidentiary error warrants reversal "only if it results in prejudice. . . . An error is prejudicial if, 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *In re Det. of West*, 171 Wn.2d 383, 410, 256 P.3d 302 (2011) (internal citation omitted) (quoting *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001)).

Here, the jury heard that J.S. told Harris that he was raped repeatedly. J.S., however, informed Wilcox that he was raped once. The jury also heard that J.S. told Harris that he was trapped for a total of three days. J.S., however, indicated to Wilcox that he was held for 30 hours or less. Finally, J.S. told Dube that a knife, razor blade, and scalpel were used in the assault; he only mentioned the knife to Wilcox.

In this case, J.S.'s statements to Wilcox never undermined J.S.'s version of events, which included that Nixon attacked him and that the attack was sexually motivated. Further, other evidence in the record supported that a sexually motivated attack occurred. First, Nixon entered a guilty plea in which he admitted that sexual intercourse with J.S. occurred and that J.S. had not consented. J.S. provided details relevant to the rape to Dube including the position he was raped in, and that Nixon penetrated both his mouth and anus with Nixon's penis. Hayden, the forensic

18

scientist with the Washington State Patrol Crime Lab, determined that penile and perineal swabs taken from J.S. were consistent with containing Nixon's DNA.

Because the other evidence, including J.S.'s own statements to Wilcox, as well as statements made to other witnesses, supported that a sexually motivated attack occurred, introduction of the inconsistent statements would not have materially affected the outcome of trial. Therefore, we hold that the trial court's error was harmless.[5]

III.     MISSING WITNESS RULE

Next, Nixon argues that the trial court erred by declining to give a missing witness instruction to the jury when J.S. failed to testify at the civil commitment trial. He argues that J.S. was particularly available to the State, and J.S.'s absence at trial was not satisfactorily explained. Because we conclude that the State did not have particular control over J.S. and J.S.'s absence was satisfactorily explained, we hold the trial court did not abuse its discretion in determining not to issue the missing witness instruction.

A missing witness instruction permits the jury to draw an unfavorable inference against a party when it fails to call a witness who it logically would have called. *State v. Blair*, 117 Wn.2d 479, 485-86, 816 P.2d 718 (1991). This instruction is warranted when (1) the potential witness's testimony is material and not cumulative, (2) the missing witness is under the particular control of one of the parties, and (3) the witness's absence is not satisfactorily explained. *State v. Montgomery*, 163 Wn.2d 577, 598-99, 183 P.3d 267 (2008).

> For a witness to be 'available' to one party to an action, *there must have been such a community of interest between the party and the witness, or the party*

---

[5] The State forwards other reasons for affirming, including Nixon's opportunity to cross-examine Dr. Fox regarding inconsistencies in J.S.'s statements. Nixon responds that jurors were informed to consider these inconsistencies only as a basis for Dr. Fox's opinion and therefore, could not use them to evaluate J.S.'s credibility. Based on our conclusion herein, we need not reach these additional issues.

*must have so superior an opportunity* for knowledge of a witness, as in ordinary experience would have made it reasonably probable that the witness would have been called to testify for such party except for the fact that his testimony would have been damaging.

*State v. Davis*, 73 Wn.2d 271, 277, 438 P.2d 185 (1968), *overruled on other grounds by State v. Abdulle*, 174 Wn.2d 411, 412, 275 P.3d 1113 (2012). "Availability 'is to be determined based upon the facts and circumstances of that witness's relationship to the parties, not merely physical presence of accessibility.'" *State v. Cheatam*, 150 Wn.2d 626, 653-54, 81 P.3d 830 (2003) (quotation marks omitted) (quoting Thomas E. Zehnle, 13 CRIM. JUST. 5, 6 (1998)).

"The inference that witnesses available to a party and not called would have testified adversely to such party arises only where, under all the circumstances of the case, such unexplained failure to call the witnesses creates a suspicion that there has been a willful attempt to withhold competent testimony."

*Davis*, 73 Wn.2d at 279 (quoting *State v. Baker*, 56 Wn.2d 846, 859, 355 P.2d 806 (1960)). "A trial court's refusal to give instructions to a jury, if based on a factual dispute, is reviewable only for abuse of discretion." *State v. Walker*, 136 Wn.2d 767, 772, 966 P.2d 883 (1998).[6]

First, Nixon argues that "close tie[s] between [the State's] interests and J.S.'s evidence" are "by themselves, sufficient to show that [J.S.] was particularly available to the State." Br. of Appellant at 27-28. Nixon relies on *Cheatam*, in which Cheatam worked for his aunt. 150 Wn.2d

---

[6] Nixon argues that it is unclear if the trial court denied the missing witness instruction based on an error of law or misapplication of the facts but that the court's decision is reversable under either standard. A trial court's "refusal to give an instruction based upon a ruling of law is reviewed de novo." *Walker*, 136 Wn.2d at 772. The trial court denied Nixon's request for a missing witness instruction, stating that "I'm not giving the missing person instruction after contemplating this issue and reading the case law. I just want to make the record clear. I do not believe it's warranted." 20 RP at 2664. Here, the trial court heard argument from the parties on the missing witness rule and thereafter determined not to give the instruction. A trial court's decision that the record before it would not support giving the instruction is a factual determination, which should be reviewed for an abuse of discretion. *Taylor v. Intuitive Surgical, Inc.*, 187 Wn.2d 743, 767, 389 P.3d 517 (2017). We agree with the State that there is nothing to show that the trial court misapplied the criteria for the rule's application.

at 653. The defense called the aunt who testified that another employee, Rocky Garrison, had "probably called Cheatam at home to wake him for work," which implied that Cheatam was at home at the time of the alleged crime. *Id*. The aunt testified that she did not know of a day when Garrison had been unable to reach Cheatam. *Id*. The defense did not call Garrison as a witness. The Supreme Court found the relationship satisfied the requirement that Garrison was under the particular control of the defense. *Id*. at 654.

Also instructive is *Davis*, 73 Wn.2d at 277-78. In *Davis*, the prosecution called one member of law enforcement whose testimony was at odds with the defendant's and failed to call an undersheriff who "was the only other person present during the interrogation and therefore the only other source of relevant evidence" as well as "was a member of the same law enforcement agency as the testifying officer." *Id*. The law enforcement agency of which the undersheriff was a part was also the agency "responsible for investigating and gathering all the evidence relative to the charges made against [the defendant]." *Id.* at 278. The Supreme Court held that "[t]he uncalled witness worked so closely and continually with the county prosecutor's office with respect to this and other criminal cases as to indicate a community of interest between the prosecutor and the uncalled witness." *Id*.

Nixon argues that the State shared a "community of interest" with J.S. Br. of Appellant at 25. He relies on the fact that J.S. was one of only two witnesses to the assault, apart from Nixon. Therefore, he argues that "the State's interests were tightly bound to [J.S.]'s evidence" and J.S.'s account was the foundation of the State's case. Br. of Appellant at 25.

In *Cheatam* and *Davis*, the missing witness instruction was proper because the parties had specific ties to the potential witnesses. In *Cheatam*, the defendant and witness were both employed by the defendant's aunt. 150 Wn.2d at 653. The evidence supported that the defendant had a close

21

relationship with the witness. In *Davis*, again, the witness had a close relationship with one of the parties, including working for the same law enforcement agency as another testifying witness and the evidence showed the prosecution had a close and continual relationship with the witness. 73 Wn.2d at 277-78. Here, other than J.S. being Nixon's victim, there is no evidence that the State had any other personal or professional ties to J.S. As of June 2021, J.S. had his own counsel. The State contacted J.S. through his counsel and the State and Nixon both had access to the same discovery regarding J.S. J.S. lacked specific ties to the State such that he was under the State's particular control.

Additionally, the State provided an explanation for J.S.'s absence. The State relied on a declaration from J.S.'s attorney in which she declared that J.S. "had been very cooperative and willing to testify" in a June 2021 deposition. CP at 980. Nonetheless, "[J.S.], unfortunately, did not participate in the deposition because the anticipation of the experience was too traumatizing to relive." CP at 980. Trial began in September 2021, and when explaining its failure to call J.S. to testify, the State explained that it had "a practice of not forcing victims to testify" as it did not "want to retraumatize them." 20 RP at 2652. This case centered on whether the crime at issue occurred with sexual motivation and the record demonstrates that J.S. would not participate in a deposition prior to trial due to his fear of being retraumatized. Here, it appears the trial court determined that this explanation was satisfactory.

Under an abuse of discretion standard, we hold that the trial court did not err because J.S. was not under the State's particular control.

IV.   ADMISSION OF A PARTY OPPONENT

In his opening brief, Nixon contends that a written statement from the deputy prosecuting attorney relevant to the 2017 criminal case should have been admitted by the trial court as an

admission of a party opponent under ER 801(d)(2). The State responds that the trial court excluded the statement on the basis that it was irrelevant to the SVP proceeding, *not* because it was hearsay or failed to meet the requirements of ER 801(d)(2). We agree with the State.

Pursuant to ER 402, evidence must be relevant to be admissible. "In an SVP civil commitment trial, evidence is relevant only if it increases or decreases the likelihood that a fact exists that is consequential to the jury's determination whether the respondent is a sexually violent predator.' *In re Det. of West*, 171 Wn.2d 383, 397, 256 P.3d 302 (2011). The determination of whether a respondent is an SVP comprises of three elements including "'(1) that the respondent has been convicted of or charged with a crime of sexual violence, (2) that the respondent suffers from a mental abnormality or personality disorder, and (3) that such abnormality or disorder makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility.'" *Id*. (internal quotation marks omitted) (quoting *In re Det. of Post*, 170 Wn.2d 302, 310, 241 P.3d 1234 (2010)). The trial court has broad discretion to determine if evidence is relevant to one of the required elements. *Id*.

In 2018, the prosecuting attorney provided reasons for amending the information in the 2017 criminal case. The prosecuting attorney stated that J.S.'s deposition disclosed information "that might cause a jury to have doubts about [J.S.'s] credibility and account of events. There are inconsistencies and memory issues in [J.S.'s] account of his actions prior to [Nixon's] assault as

well as in the account of the assault itself." CP at 89. She explained that the amended charges would "secure[] three felony convictions, two strike offenses, a prison sentence, three years of supervision, and a requirement that [Nixon] register as a sex offender after release," and "t[ake] into account evidentiary difficulties in proceeding on the original charges." CP at 89-90. The prosecuting attorney then checked a box indicating a belief that "[e]videntiary problems exist which make conviction on the original charge doubtful." CP at 90.

Here, the trial court determined that the State's statement was confined to explaining the attorney's opinion on why they were amending the charges in the 2017 criminal case and did not pertain to the civil commitment case before it. The State's opinion is not material or probative of whether in fact the crime was committed with sexual motivation, nor does it bear on the credibility of any of the witnesses, or any of the elements or defenses at issue in the case.[7]

We hold that the trial court did not err in determining that the State's statement was not relevant.

V.      TESTIMONY REGARDING A RECENT OVERT ACT AS AN ADDED DETERRENT

Nixon argues that the trial court should have permitted him to testify that the threat of a recent overt act petition served as an added deterrent to the commission of a future sexual offense. The State responds that Nixon's responses that a recent overt act could act as an added deterrent were "equivocal at best" and his denial of having ever committed a sexual offense demonstrated that the threat of a recent over act petition was irrelevant. Br. of Resp't at 36. The State also argues that permitting Nixon to testify to the deterrent effect of a recent overt act would potentially

---

[7] Even if the State's opinion was relevant to any issue, the State was not the party opponent in this case.

confuse the issues and mislead the jury. Br. of Resp't at 36.[8] We agree with Nixon but conclude that any error is harmless.

An SVP is defined as "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(19). In determining if a person is an SVP, one of the elements that a jury must consider is whether the mental abnormality or personality disorder "makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." *Post*, 170 Wn.2d at 309-10 (quoting former RCW 71.09.020(18) (2009)).

A recent overt act is defined as "any act, threat, or combination thereof that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act or behaviors." RCW 71.09.020(13). Pursuant to RCW 71.09.030(1)(e), an SVP petition may be filed against a person formerly convicted of a sexually violent offense and has since been released from total confinement and has committed a recent overt act.

In *Post*, the State Supreme Court stated that "[e]vidence that a respondent in an SVP proceeding who is subsequently released could be subject to another SVP proceeding if he commits a recent overt act is relevant and is a condition that would exist upon placement in the community." 170 Wn.2d at 316. The court stated that a respondent's "knowledge of the

---

[8] The State also argues that it was not required to prove that Nixon committed a recent overt act, therefore, "testimony about its meaning and the related technicalities would be irrelevant to the material issues of fact at trial." Br. of Appellant at 37. The State further argues that "testimony about the possibility of detection indicates that Nixon somehow may be monitored for his lifetime in the community, which would also serve to mislead the jury. The court properly excluded Nixon's testimony about this collateral issue." Br. of Appellant at 37. For the reasons explained herein, we hold that the trial court erred by omitting evidence of a recent overt act.

consequences for engaging in such conduct may well serve as a deterrent to such conduct and, therefore, has some tendency to diminish the likelihood of his committing another predatory act of sexual violence. This likelihood, of course, is an element that the jury must address. *Id*. at 316-17. In *Post*, the court declined to rule on the admissibility of a recent overt act petition, stating that the evidence would still be subject to ER 403 issues of unfair prejudice and confusion which issues are best addressed by the trial court. *Id*. at 317.

During Nixon's deposition, he testified that he knew about the consequences that would result from the commission of a recent overt act. He explained that he could be subject to another SVP proceeding if he committed an act that fell short of a crime. Nixon also stated twice that the possibility of a recent overt act petition was an added deterrent. Nixon's testimony specific to knowledge of the legal significance of a recent overt act and his statements that the possibility of a new civil commitment petition against him for committing a recent overt act made the evidence relevant to the likelihood that he would commit another predatory act of sexual violence if released. Because Nixon stated that he knew the consequences for engaging in a recent overt act and indicated that it was an added deterrent to committing a future offense, the evidence was relevant to the matter before the trial court.

The State, however, cites ER 403 for the proposition that the relevance of the recent overt act was substantially outweighed by potential confusion of the issues and possibility of misleading the jury.

Under ER 403:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

A trial judge has "'wide discretion in balancing the probative value of evidence against its potentially prejudicial impact.'" *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 671, 230 P.3d 583 (2010) (*State v. Stenson*, 132 Wn.2d 668, 702, 940 P.2d 1239 (1997)).

The State argues that additional witnesses would be required to provide context for the recent overt act petition, including to explain the technicalities and meaning of a recent overt act, and "the detailed detection and filing processes." Br. of Resp't at 36-37. The State argues that "[b]ecause the State was not required to prove that Nixon committed a[recent overt act], testimony about its meaning and the related technicalities would be irrelevant to the material issues of fact at trial." Br. of Resp't at 37.

Here, the jury was required to consider Nixon's likelihood of reoffending. The State's argument that providing context for a recent overt act petition, calling additional witnesses to explain the substance of a recent overt act and needing to inform the jury on the issue, is not a basis for excluding the evidence. But, the only evidence Nixon sought to be introduced was his knowledge of the concept of a "recent overt act" and its deterrent effect. This evidence alone would not result in prejudice or confusion of the issues, or needless waste of time. Even so, to exclude on this basis, the court was required to engage in an ER 403 analysis on the record, which it failed to do. The trial court erred in excluding this evidence.

Notwithstanding the trial court's error in excluding the evidence of a recent overt act, we hold that any error was harmless. Nixon fails to show that the outcome of the trial would have been materially affected had the evidence been admitted. Here, the evidence went to whether Nixon was likely to engage in predatory acts of sexual violence. Other evidence supported Nixon's likelihood to reoffend. First, Nixon denied that he had ever committed a sexual offense. The record shows, however, that Nixon pleaded guilty to rape in the third degree, and he submitted a

27

statement admitting that he had engaged in sexual intercourse with J.S. without J.S.'s consent. The jury heard testimony that Nixon had previously offended while on Department of Corrections supervision. Additionally, multiple witnesses testified to forced sexual encounters with Nixon. In light of all the evidence, any error was harmless.

VI.     RIGHT TO PUBLIC TRIAL

Nixon argues that the trial court violated the public trial right as provided in article I, section 10 of the Washington Constitution. The State responds that five of the in-chambers proceedings did not implicate the public trial right and any errors alleged as to the other proceedings were harmless. But even assuming the trial court closures implicated the public trial right, we hold that any error was harmless.

A.     Legal Principles

The right to the open administration of justice is guaranteed by the Washington Constitution. WASH. CONST. art. I, § 10. The requirement that "'[j]ustice in all cases shall be administered openly'" applies in civil and criminal cases. *In re Appointment of Special Deputy Prosecuting Attorney*, 193 Wn.2d 777, 787, 446 P.3d 160 (2019) (quoting WASH. CONST. art, 1, §10)). In criminal cases, a violation of the public trial right results in structural defect, which does not require a defendant to show prejudice. *State v. Watt*, 160 Wn.2d 626, 632, 160 P.3d 640 (2007). In civil proceedings, however, our Supreme Court has held that a deprivation of the public trial right is not structural error. *In re Det. of Reyes*, 184 Wn.2d 340, 346, 358 P.3d 394 (2015). Whether there has been a violation of the public trial right is a question of law reviewed de novo. *Id.* at 344.

The Supreme Court has adopted a framework for determining whether a violation of the public right to trial occurred. *State v. Smith*, 181 Wn.2d 508, 521, 334 P.3d 1049 (2014). The first step in determining whether a violation occurred is to ask if the proceeding implicated the public trial right. *Id*. If the public trial right is implicated, the next step requires the trial court to ask whether the proceeding was closed. *Id*. If the proceeding was closed, the final step asks whether the closure was justified. *Id*. "The appellant carries the burden on the first two steps; the proponent of the closure carries the third." *State v. Love*, 183 Wn.2d 598, 605, 354 P.3d 841 (2015).

The Supreme Court has also outlined five criteria in *State v. Bone-Club,* 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995), that a trial court "*must* consider on the record in order to close trial proceedings to the public." *Wise*, 176 Wn.2d at 10. The *Bone-Club* factors require the trial court to at least do the following:

> name the right that a defendant and the public will lose by moving proceedings into a private room; name the compelling interest that motivates closure; weigh these competing rights and interests on the record; provide the opportunity for objection; and consider alternatives to closure, opting for the least restrictive.

*Wise*, 176 Wn.2d at 10.

We assume without deciding that all the closures implicated the public trial right. Further, because the proceedings occurred in chambers, the State does not contest that the proceedings were closed. And, because the trial court did not consider the *Bone-Club* factors, the State concedes that the closures were not justified, indeed in our view they could not be, absent the proper *Bone-Club* analysis.

B. Harmless Error

Nixon and the State agree that we should apply the constitutional harmless error test to any courtroom closures that we deem improper. A constitutional error does not require reversal when it is clear beyond a reasonable doubt that the jury verdict is unattributable to the error. *Watt*, 160

29

Wn.2d at 635. In *Reyes*, the Supreme Court declined to grant the respondent relief after stating that there was no evidence that an improper closure of a pretrial hearing "impact[ed] any of the evidence at the SVP commitment hearing, nor did it influence the outcome in any way." 184 Wn.2d at 348

Nixon argues that the trial court violated the public trial right by closing the proceedings on 13 different occasions. The State asserts that the closures were harmless. We conclude the closures were harmless.

1.     Eleven Closures Resulting in Rulings in Favor of Nixon

Here, the trial court ruled in Nixon's favor on 11 of the 13 closures. Even assuming unjustified closures where the public trial right was implicated, there is no error impacting the outcome of the trial where the defendant benefitted from rulings in his favor. *State v. Weber*, 159 Wn.2d 252, 279, 1 49 P.3d 646 (2006). Further, the in-chambers proceedings were memorialized by the court reporter, which means that a member of the public could discover the basis for the challenge. Because there is no evidence that the outcome of the trial was affected by these in-chamber proceedings, we hold that that the error was harmless.

2.     Two Closures Resulting in Rulings Against Nixon

Of the two closures resulting in rulings against Nixon, one involved impeachment evidence under ER 806. Again, we assume without deciding that the closure implicated the public trial right and that it was unjustified.

During testimony, Nixon asked Wilcox about statements J.S. made in order to impeach hearsay statements made to other witnesses. In open court, the State raised an objection based on hearsay, to which Nixon's counsel responded that Nixon was permitted to impeach J.S. under ER 806. An in-chambers meeting followed regarding whether Nixon had the right to impeach J.S.'s

hearsay statements made to other witnesses through allegedly inconsistent statements made to Wilcox under ER 806. The trial court excluded the evidence.

Specifically, Nixon sought admission of impeachment evidence where J.S. variably reported that he was held for three days, then reported 36 hours; reported that knives and a scalpel were used, then reported a knife was put in his mouth; reported that he was raped multiple times, then reported that he was raped once. Here, even if J.S.'s credibility were called into question, at no time did J.S. report that he was not held against his will, was not threatened with a knife, or was not raped. The aspects of impeachment did not go toward undermining any of the elements of the SVP petition required to be proved by the State. The fact of sexual motivation and use of force were admitted by Nixon himself as part of his statement on plea of guilty. We are satisfied that this ruling occurring outside immediate public view, but recorded for later discovery, in light of all the other evidence presented to the jury, did not change the outcome of the trial.

The second closure resulting in a ruling against Nixon involved questioning of SANE Dube regarding whether she observed J.S. to be under the influence of intoxicants. On direct examination the State asked Dube if she "ha[d] training and experience in drug, in narcotic use?" 10 RP at 1211. Nixon asked to be heard on the issue. A meeting occurred in chambers. In chambers, Nixon argued that Dube testified in her deposition that she could not recall anything other than what she wrote in her report, and her report did not mention methamphetamine use. The State responded that Dube had written that J.S. believed Nixon had given him methamphetamine.

The trial court permitted the question, informing Nixon's counsel that if Dube answered affirmatively, she would then be open for cross-examination or impeachment. On returning to open court, the State continued its questioning, repeating its question regarding Dube's training with regarding to symptoms of methamphetamine. Dube stated that she was trained to recognize

signs of methamphetamine use, however she later stated that she did not see any signs or symptoms that J.S. was under the influence of methamphetamine. On cross-examination, Dube testified that it was not her job to determine if J.S. was under the influence of methamphetamine.

Even though the court, over Nixon's objection, allowed the State to question Dube on whether she observed symptoms of intoxication on the part of J.S., Dube answered that she did not observe signs of intoxication and moreover that it was not her job to determine if J.S. was under the influence of intoxicants. We are satisfied that this ruling outside immediate public view, but recorded for later discovery, in light of all the other evidence presented to the jury, would not have changed the outcome of the trial.

VII. PRESUMPTION AGAINST SVP

Nixon argues that the trial court erred by not permitting him to argue that a presumption against civil commitment exists. Nixon argues that the presumption that a respondent in an SVP proceeding does not meet the criteria for commitment is similar to the presumption of innocence in criminal cases. The State responds that Washington case law establishes that no such presumption exists in SVP civil commitment cases. The State also argues that even if such a presumption exists, the failure to permit the argument is not reversible error. We agree with the State.

Nixon argues that the presumption against civil commitment exists as a matter of law. We review questions of law de novo. *State v. Kipp*, 179 Wn.2d 718, 726, 317 P.3d 1029 (2014); *State v. Jim*, 173 Wn.2d 672, 678, 273 P.3d 434 (2012).

Washington courts have consistently held that a respondent in an SVP proceeding is not entitled to a presumption of innocence instruction, distinguishing civil proceedings from criminal proceedings. *In re Det. of Law*, 146 Wn. App. 28, 48-49, 204 P.3d 230 (2008); *In re Det. of*

*Twining*, 77 Wn. App. 882, 895, 894 P.2d 1331 (1995), *abrogated on other grounds by In re Det. of Pouncy*, 168 Wn.2d 382, 390-91, 229 P.3d 678 (2010); *In re Det. of Aqui*, 84 Wn. App. 88, 101, 929 P.2d 436 (1996), *abrogated on other grounds by In re Det. of Henrickson*, 140 Wn.2d 686, 697, 2 P.3d 473 (2000).

We agree with Divisions One and Three of this court that there is no presumption that a respondent in an SVP civil commitment proceeding does not meet the criteria for commitment. As the court in *Law* concluded, sexually violent predator proceedings under chapter 71.09 RCW are not criminal proceedings. 146 Wn. App. at 48-49. The *Law* court wrote specifically of the presumption of innocence that it does not apply because there is no corresponding burden upon the State to "prove beyond a reasonable doubt each element of a crime." *Id.* at 48. In *Twining*, the court noted that the "presumption of innocence in criminal trials is closely related to the State's burden to prove each element of a crime beyond a reasonable doubt. However, the presumption of innocence instruction 'conveys to the jury a special and additional caution to consider only the evidence before them and not to surmise anything based on a defendant's present situation.'" 77 Wn. App. at 895 (quoting *In re Pers. Restraint of Lile*, 100 Wn.2d 224, 227, 668 P.2d 581 (1983)). But civil proceedings like the one here do not require such proof.

Accordingly, the need for the presumption is nonexistent. The trial court did not err in refusing to instruct the jury that Nixon was presumed not to meet the commitment criteria.

VIII.   CUMULATIVE ERROR

Nixon argues that under the cumulative error doctrine, we should reverse as numerous errors affected the fairness of his trial.

"The cumulative error doctrine applies where a combination of trial errors denies the accused of a fair trial, even where any one of the errors, taken individually, would be harmless."

*In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). When, under the totality of the circumstances, it is shown that the accumulation of errors substantially prejudiced the defendant and denied him a fair trial, reversal is required. *Id*. We will not reverse if the evidence against a defendant is overwhelming. *Id.* at 691.

Here, the errors included the trial court's determination that Nixon could not introduce evidence of inconsistent statements in order to impeach J.S.'s hearsay statements, the trial court's determination that Nixon could not testify regarding the threat of a recent overt act petition and violations to Nixon's public trial right as shown by a number of the in-chambers proceedings. But each of these errors was harmless. When examining these errors in the context of the entire trial, we conclude that Nixon was not deprived of a fair trial.

## CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Maxa, J.

Cruser, A.C.J.